GP#3711001167

## PURCHASE AND SALE AGREEMENT

## MERIDIAN MARINA

## LOCATED AT

## 1400 SW CHAPMAN WAY, PALM CITY, MARTIN COUNTY, FLORIDA 34990

### RECITALS

A.      On June 27, 2019, Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, as amended, and collectively with the Federal Rules of Bankruptcy Procedures, the "Bankruptcy Code"), commencing a bankruptcy proceeding (the "Bankruptcy Case") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court");

B.      Seller desires to sell to Purchaser the Property, and Purchaser desire to purchase the Property from Seller upon the terms and conditions set forth herein.  The transaction contemplated by this Agreement may be referred to as the "Transaction";

C.      Purchaser and Seller intend to effectuate the Transaction through the sale of the Property under, among others, sections 105, 363 and 365 of the Bankruptcy Code; and

D.      The Transaction is subject to approval of the Bankruptcy Court and will be consummated only after entry of the Sale Order (defined herein) to be entered in the Bankruptcy Case

### ARTICLE 1:  PROPERTY/PURCHASE PRICE

1.1     Certain Basic Terms.

(a)     Purchaser and Notice Address:

1400 Chapman, LLC, a Texas limited liability company
c/o Pinchal & Company
4400 Post Oak Parkway, Suite 2350
Houston, TX 77027
Attn:  Brian W. McMackin
Telephone:  713.961.4488
Email:  brian@pinchal-co.com

With a copy to:

Hunton Andrews Kurth LLP
Sabadell Financial Center
1111 Brickell Ave, Suite 2500
Miami, FL 33131
Attn:  Jonathan Z. Kurry
Telephone:  305.810.2491
Email:  JKurry@Hunton.com

(b)     Seller and Notice Address:

Meridian Marina & Yacht Club of Palm City LLC
1400 SW Chapman Way
Palm City, FL. 34990
Attn:  Tim Mullen
Telephone:  561-310-5295
Email:  kc@meridianmarina.com

With a copy to:

| | | |
|---|---|---|
| (c) | Date of this Agreement: | The latest date of execution by Seller and Purchaser, as shown on the signature page hereto |
| (d) | Purchase Price: | $6,500,000 |
| (e) | Initial Deposit: | $50,000 |
| (f) | Additional Deposit: | $50,000 |
| (g) | Earnest Money: | Collectively, the Initial Deposit and the Additional Deposit, together with any other deposits of earnest money made pursuant to the terms of this Agreement. The definition of "Earnest Money" includes any interest earned thereon. |
| (h) | Due Diligence Period: | The period ending at 5:00 ET on date sixty (60) days after the Date of this Agreement. |
| (i) | Closing Date: | The date that is the later of (i) fifteen (15) days after entry of the Sale Order or (ii) thirty (30) days after expiration of the Due Diligence Period, subject to extension as provided herein |
| (j) | Title Company and Escrow Agent: | Chicago Title Insurance Company – Commercial 609 Main Street, Suite 2350 Houston, Texas 77002 Attention: Ria S. van Dright Phone: (713) 238-9163 eMail: Ria.vandright@fnf.com |

1.2    Property.  Subject to the terms of this Purchase and Sale Agreement (this "Agreement"), Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following property (the "Property"):

(a)    The real property described in Exhibit A (the "Land"), together with the buildings and improvements thereon (the "Improvements"), and all right, title and interest of Seller in and to appurtenances of the Land, including riparian rights, easements and rights-of-way relating thereto, and, without warranty, all right, title and interest of Seller in and to the land lying within any street or roadway adjoining the Land or any vacated or hereafter vacated street or alley adjoining said Land.

(b)    All of Seller's right, title and interest, if any, in and to all fixtures, furniture, equipment, and other tangible personal property, if any, owned by Seller (collectively, the "Personal Property") presently located on the Land or used in connection with the Property, including, without limitation, all: (i) vehicles and watercraft, including trailers and travel-lifts (the "Vehicles"), (ii) telephone systems and computer equipment, including software installed thereon, (iii) third party vendor parts and accessories located at the Property or in transit to the Property on the Closing Date and (iv) gasoline, motor oil, and other similar fuel and fluids currently stored on the Property.  An inventory of the Personal Property is set forth on Exhibit B (the "Inventory").

(c)    All of Seller's interest in that certain Lease dated _____ between Seller, as landlord, and the General Services Administration (the "GSA"), as tenant, if any (as may be amended from time to time, the "GSA Lease").

2

(d)    All of Seller's interest, as landlord, in the "Leases," being all leases of the Improvements, all leases, licenses and occupancy agreements which may be made by Seller after the date hereof and before Closing as permitted by this Agreement, including all amendments thereto, but excluding the GSA Lease.

(e)    All of Seller's right, title and interest, if any, in and to all of the following items, to the extent assignable and without representation or warranty (the "Intangible Personal Property"): (i) licenses, permits and approvals relating to the ownership or operation of the Property, (ii) the right to use the name of the property, (iii) the right to use the marks identifying the Property, including, without limitation, "Meridian Marina & Yacht Club" (iv) all guaranties and warranties received by Seller from any contractor, manufacturer or other person in connection with the ownership or operation of the Property, (v) any domain names and web sites owned or used by Seller, (vi) Seller's lists of all tenants and customers of Seller and all corresponding service records for such tenants and customers, (vii) all plans and specifications related to the Property and (viii) all the goodwill of the business conducted by Seller on or about the Property.

1.3    Earnest Money; Initial Deposit and Additional Deposit. The Initial Deposit, in immediately available federal funds, evidencing Purchaser's good faith to perform Purchaser's obligations under this Agreement, shall be deposited by Purchaser with the Escrow Agent not later than three (3) business days after the Date of this Agreement. In the event that Purchaser fails to timely deposit the Initial Deposit with the Escrow Agent, this Agreement shall be of no force and effect. Unless Purchaser shall have terminated this Agreement pursuant to Paragraph 2.4, Purchaser shall deposit the Additional Deposit with the Escrow Agent not later than the next business day after the expiration of the Due Diligence Period. In the event Purchaser fails to timely deposit the Additional Deposit with Escrow Agent, such failure shall constitute a material default by Purchaser under this Agreement. At Closing, the Earnest Money shall be applied to the Purchase Price. Otherwise, the Earnest Money shall be delivered to the party entitled to receive the Earnest Money in accordance with the provisions of this Agreement.

1.4    Cure Costs. Upon the Closing, Seller shall pay or cause to be paid from the proceeds of the Purchase Price, pursuant to and in accordance with section 365 of the Bankruptcy Code and the Sale Order, all cure and reinstatement costs or expenses relating to the assumption and assignment of the Leases and any other unexpired lease or executory contract (the "Cure Costs") to which Seller is a party and which Purchaser desires to have assumed and assigned to Purchaser in conjunction with the purchase of the Property.

1.5    Contract Designation. Notwithstanding anything to the contrary herein, Purchaser may, from time to time prior to the Closing Date in its sole discretion designate any Lease or other executory contract or unexpired lease for assumption and assignment by Seller to Purchaser. Any executory contract or unexpired lease not designated by Purchaser shall not be acquired by Purchaser.

## ARTICLE 2: INSPECTIONS

2.1    Property Information. Seller has made available to Purchaser, to the extent in Seller's possession or control, copies of or access to (with the right to copy) the following (collectively, "Property Information"):

(a)    the standard form of storage lease used by Seller for the Property;

(b)    a current rent roll of the Property, indicating storage spaces subject to executed Leases, and security deposits and other deposits held (the "Rent Roll");

(c)    copies of any management, marketing, leasing, service or maintenance agreements, if any, relating to the Property to which Seller is a party (the "Contracts");

(d)    all tax returns, profit and loss statements, balance statements, operating statements, and records of occupancy and rates, all as used by Seller in the ordinary course of the operations of the Property for the previous five (5) years (the "Financials");

(e)    copy of the most recent survey of the Property;

3

(f)        copies of the Leases and all correspondence in connection therewith;

(g)        all construction plans, drawings and specifications for the development and construction of the Improvements on the Property; and

(h)        all existing title policies concerning the Land; all existing studies and reports (including all environmental. soil and geotechnical testing) prepared with respect to the Land; all plans, plats, licenses, appraisals, permits, authorizations, plans, specifications, development orders, feasibility studies, approvals and other intangibles rights pertaining to the ownership and/or operation of the Property or any portion thereof; all maintenance, property and operational contracts; copies of real estate tax bills (including special assessments) for the prior three (3) years, including evidence of payment; and any other documents pertaining to the Property or Seller's business conducted thereon to the extent in Seller's control or possession.

2.2       Inspections.  Subject to the rights of tenants and the provisions of Paragraph 2.3 below, during the Due Diligence Period, Purchaser may make a complete review and inspection of the physical, legal, economic and environmental condition of the Property, including, without limitation, any leases and contracts affecting the Property, soil condition, asbestos, PCB, hazardous waste, toxic substance or other environmental matters, compliance with building, health, safety, land use and zoning laws, regulations and orders, plans and specifications, structural, life safety, HVAC and other building system and engineering characteristics, and other information pertaining to the Property or Seller's business which it desires to review.

2.3       Conduct of Inspections.

(a)        Inspections in General.  Prior to Closing, Purchaser, its agents, and employees shall have the right to enter the Property (subject to the rights of tenants) for the purpose of (a) reviewing leases and contracts and any records relating thereto; (b) reviewing records relating to the operating expenses; and (c) inspecting the physical condition of the Property and conducting physical and environmental inspections of the Property.  Before any such entry, Purchaser shall provide Seller with a certificate of insurance naming Seller as an additional insured and with limits of not less than $1,000,000 per occurrence.  All of such entries upon the Property shall be at reasonable times, during normal business hours.  Purchaser shall indemnify, defend and hold harmless Seller from and against any and all losses, costs, damages, claims, or liabilities arising out of or in connection with any entry or inspections performed by Purchaser, its agents or representatives; provided however, in no event shall Purchaser be liable for any loss, liability, claims. costs, liens or damages arising out of or attributable to (i) a diminution in the value of the Property as a consequence of the results revealed by the tests, inspections, and studies conducted by Purchaser or (ii) the discovery of Hazardous Materials (as hereinafter defined) in, on or under the surface of the Property as of the date such inspections are conducted by or on behalf of Purchaser.

(b)        This indemnity shall survive the Closing and any termination of this Agreement.  In addition, Purchaser shall keep the Property free from any liens arising out of any work performed, materials furnished or obligations incurred by or on behalf of Purchaser or Purchaser's agents with respect to any inspection or testing of any Property.

(c)        Environmental Inspections and Release.  Purchaser's inspections under Paragraph 2.3(a) may include a Phase I environmental inspection of the Property, but no Phase II environmental inspection, or other invasive inspection, shall be performed without the prior consent of Seller, not to be unreasonably withheld, conditioned or delayed; provided that Purchase may conduct invasive testing in connection with the pre-existing underground storage tank on the Property, if such testing is recommended by any Phase I inspection.

2.4       Termination During Due Diligence Period.  If Purchaser determines, in its sole discretion, for any reason or for no reason, that the Property is unacceptable for Purchaser's purposes, Purchaser shall have the right to terminate this Agreement by giving to Seller notice of termination before the expiration of the Due Diligence Period, whereupon Seller shall authorize the Escrow Agent to refund the Earnest Money to Purchaser, and neither party shall have any further rights or liabilities hereunder except for those provisions which expressly survive the termination of this Agreement.  In the event of such termination, Purchaser shall promptly return to Seller or destroy all Property Information in Purchaser's possession or control.  Purchaser's failure to terminate this Agreement before the expiration of the Due Diligence Period shall be deemed a waiver of the condition set forth in Paragraph 5.1(a).

4

2.5    <u>Purchaser's Reliance on its Investigations</u>.  Except as provided herein and the warranty of title in the deed delivered at the Closing ("<u>Seller's Warranties</u>"), this sale is made and will be made without representation, covenant, or warranty of any kind (whether express, implied, or, to the maximum extent permitted by applicable law, statutory) by Seller.  Purchaser agrees to accept the Property on an "As is" and "Where is" basis, with all faults and any and all latent and patent defects, and without any representation or warranty, all of which Seller hereby disclaims, except for Seller's Warranties.  The provisions of this <u>Paragraph 2.5</u> shall survive indefinitely any closing or termination of this Agreement and shall not be merged into the closing documents.

<u>ARTICLE 3:  TITLE AND SURVEY REVIEW</u>

3.1    <u>Title Review</u>.  Purchaser may, at its expense, secure during the Due Diligence Period any title commitment or report from the Title Company ("<u>Title Report</u>") and/or survey update (the "<u>Survey</u>") desired by Purchaser with respect to the Property.  Furthermore, Purchaser shall have the right to request that the Title Company provide at Purchaser's sole cost and expense any reinsurance or endorsements Purchaser shall request with respect to such Title Report.

3.2    <u>Title Objections</u>.  Purchaser may advise Seller not later than ten (10) days prior to the expiration of the Due Diligence Period, which exceptions to the Title Report or Survey other than Permitted Exceptions (as hereinafter defined), if any, are not acceptable to Purchaser (the "<u>Title Objections</u>").  Seller shall have five (5) days after receipt of Purchaser's Title Objections to give Purchaser notice that (a) Seller will remove any exception which is the subject of a Title Objection from title or afford the Title Company necessary information or certifications to permit it to insure over such exceptions or (b) Seller elects not to cause such exceptions to be removed or insured over.  Seller's failure to provide timely notice to Purchaser as to any Title Objection shall be deemed an election by Seller not to remove or insure over the Title Objection.  If Seller so notifies or is deemed to have notified Purchaser that Seller will not remove or insure over any or all of the Title Objections, Purchaser shall have until before the expiration of the Due Diligence Period to determine whether (i) to waive such Title Objections which Seller has elected not to remove or insure over and proceed with the purchase and take the Property subject to such exceptions or (ii) to terminate this Agreement.  Purchaser's failure, before the end of the Due Diligence Period, to give Seller notice to terminate this Agreement shall be deemed to be an election by Purchaser under clause (i) of the preceding sentence.

3.3    <u>Permitted Exceptions</u>.  "<u>Permitted Exceptions</u>" shall include and refer to:  all zoning and building laws, ordinances, maps, resolutions, and regulations of all governmental authorities having jurisdiction which affect the Property and the use, improvement or enjoyment thereof; matters affecting title created by or with the consent of Purchaser; liens to secure taxes and assessments not yet due and payable.  Notwithstanding the foregoing, Seller shall remove at Seller's sole cost and expense on or prior to the Closing Date and there shall not be treated as a Permitted Exception any mortgage or other liens encumbering the Property that arise by, through or under Seller (collectively, "<u>Mortgages/Liens</u>").

3.4    <u>Intervening Exceptions</u>.  In the event the Title Report is amended to include new exceptions that are not set forth in a prior Title Report, Purchaser shall have five (5) Business Days after Purchaser's receipt of the amended Title Report within which to notify Seller of any such exceptions to which it objects, provided such new exceptions have not been created by Purchaser or its contractors or agents.  If Purchaser objects to any such exceptions, Seller shall have five (5) Business Days from receipt of Purchaser's objection(s) to remedy such exceptions by waiver or endorsement to the Title Report acceptable to Purchaser; provided, Seller shall have no obligation to cure any such new objections unless such are Mortgages/Liens or otherwise are the result of the acts or omissions of Seller (which shall also be deemed to be Mortgages/Liens under this Agreement).  If Seller is unable or unwilling to cure any new objections that Seller is not otherwise under this Agreement obligated to cure within five (5) Business Days after the date of Purchaser's notice of such new objections, then Purchaser may, as its sole and exclusive remedy, (i) not more than five (5) Business Days after the expiration of Seller's 5-Business Day cure period, terminate this Agreement and receive the Earnest Money immediately from the Escrow Agent without the need for obtaining further consent or instruction from Seller, and thereafter all obligations hereunder shall terminate, except as otherwise provided herein or (ii) waive such objections to any uncured new matter and the transaction contemplated by this Agreement shall close as scheduled.  If written notice of objection under this Paragraph 3.4 is not timely given by Purchaser to Seller,

then Purchaser shall be deemed to have approved of the condition of the title of the Land and Improvements as shown by the amended Title Report (other than as to Mortgages/Liens) and such uncured new matters (other than Mortgages/Liens) shall be part of the Permitted Exceptions. Notwithstanding the foregoing, nothing contained in this Paragraph 3.4 shall extend the Closing Date.

3.5     Affidavits.  Seller shall execute and deliver at closing an owner's affidavit in a form reasonably acceptable to the Title Company with respect to authority, the rights of tenants in occupancy, the status of mechanics' liens and such other matters as the Title Company may request.

## ARTICLE 4:  OPERATIONS AND RISK OF LOSS

4.1     Ongoing Operations.  During the pendency of this Agreement, Seller shall carry on its business and activities relating to the Property, including marketing and leasing of the Property, in a prudent and businesslike manner substantially in the same manner as it did before the Date of this Agreement, and in accordance with all requirements of the Leases and the GSA Lease. Seller shall:  (i) continue to maintain all of the present services to the Property, (ii) make all repairs and replacements in the ordinary course of business to the Property to the extent Seller, and not Seller's tenants (if any), are responsible for such repairs and replacements, and in the event that Seller's tenants (if any) are contractually obligated to Seller to effectuate such repairs and replacements, Seller shall use reasonable efforts to enforce Seller's contractual rights, and (iii) not remove any of Seller's personal property from the Property except if such personal property has become obsolete or in replacement of same with substantially similar items.  In addition, Seller shall make all payments due prior to Closing in connection with the Property, including all utility payments and payments on any other obligations affecting the Property.  Any brokerage fees or similar commissions which are or will become due and payable in connection with any of the Leases and the GSA Lease shall be paid in full by Seller at or prior to Closing.

4.2     Performance under Leases and Contracts.  During the pendency of this Agreement, Seller will perform in all material respects its obligations under the Leases, the GSA Lease and the Contracts.

4.3     New Contracts and Leases.  Seller will not at any time, without the prior consent of Purchaser, enter into any lease or any other contract relating to the operation of the Property that will be an obligation affecting the Property subsequent to the Closing, except for storage Leases in the ordinary course of Seller's business, on the same form customarily used by Seller, so long as the fees for the same are those published by and customarily charged by Seller in the ordinary course of Seller's business.

4.4     Termination of Contracts.  During the Due Diligence Period, Purchaser shall notify Seller which of the Contracts Purchaser wishes to assume at Closing. Failure to timely deliver such notice shall constitute Purchaser's binding election to reject all Contracts.  Notice of termination for all Contracts not assumed by Purchaser shall be given by Seller not later than the Closing Date and any charges accruing thereunder on or after the Closing Date and through the date of actual termination shall be the responsibility of Seller. Notwithstanding the foregoing, on or before the Closing, Seller shall terminate any management agreements in effect with respect to the Property at the sole cost and expense of Seller.

4.5     Damage or Condemnation.  Risk of loss resulting from any fire, flood or any other casualty before the Closing, shall remain with Seller.  If before the Closing, the Property shall be materially damaged, or if the Property or any material portion thereof shall become the subject of any proceedings, judicial, administrative or otherwise, with respect to the taking by eminent domain or condemnation, then Purchaser may terminate this Agreement by written notice to Seller given within 5 days after Purchaser learns of the damage or taking, in which event the Earnest Money shall be returned to Purchaser.  If the Closing Date is within the aforesaid 5-day period, then Closing shall be extended to the next business day following the end of said 5-day period.  If no such election is made, and in any event if the taking or damage is not material (as applicable), this Agreement shall remain in full force and effect and the purchase contemplated herein, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this purchase, Seller shall assign, transfer and set over to Purchaser all of the right, title and interest of Seller in and to any awards that have been or that may thereafter be made for such taking, and Seller shall assign, transfer and set over to Purchaser any insurance proceeds that may thereafter be made for such damage or destruction, and receive from Seller at Closing a credit in the amount of any deductible or uninsured loss.

6

For the purposes of this paragraph, the phrases "material damage", "materially damaged", "material portion", and "material taking" shall mean with respect to the Property (a) damage reasonably exceeding $50,000 to repair, or (b) taking of the Property which has a value reasonably exceeding $50,000.

## ARTICLE 5: CONDITIONS PRECEDENT

5.1    Purchaser's Conditions. Notwithstanding anything in this Agreement to the contrary, Purchaser's obligation to purchase the Property shall be subject to and contingent upon the satisfaction or waiver of the following conditions precedent:

(a)    Inspection. Purchaser's inspection and approval, in Purchaser's sole and absolute discretion, within the Due Diligence Period, of all matters relating to the Property, pursuant to Paragraph 2.2.

(b)    Performance.  Seller's performance of its obligations under this Agreement and the truth and accuracy of Seller's representations and warranties in this Agreement as of the Closing Date.

(c)    Casualty or Condemnation.  The Purchaser has not elected to terminate this Agreement pursuant to Paragraph 4.5.

(d)    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a final order, not subject to appeal or a stay pending appeal, in full force and effect and shall not have been modified, amended, rescinded or vacated in any material respect.  "Sale Order" shall mean an order of the Bankruptcy Court that, among other things (i) finds that notice of the hearing concerning approval of this Agreement and the Transaction was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances; (ii) is not subject to a stay pending appeal; (iii) approves the Transaction contemplated by this Agreement and the terms and conditions hereof; (iv) is acceptable in form and substance to Purchaser and is not inconsistent with the terms of this Agreement; (v) finds that the Purchaser is a "good faith" Purchaser entitled to the protections afforded by section 363(m) of the Bankruptcy Code; (vi) provides that the Transaction is not subject to avoidance under section 363(n) of the Bankruptcy Code; and (vii) provides for the vesting of the Property in Purchaser free and clear of all liens, claims and encumbrances to the maximum extent permitted by section 363 of the Bankruptcy Code and applicable law.

(e)    Environmental Condition. Seller shall have obtained and delivered to Purchaser a "no further action letter" reasonably acceptable to Purchaser from the applicable governmental authorities having jurisdiction over the Property with respect to the remediation and/or removal of the pre-existing underground storage tank at the Property. Seller will make best effort, however, is unlikely to receive a no further action by the closing date. Seller will agree to a reserve from closing proceeds of 150% of the estimated amount of closure costs from an environmental company, as determined by the parties during the Due Diligence Period.

(f)    New GSA Lease.  The GSA Lease shall have been terminated, and the GSA shall have irrevocably committed to enter into a new lease with Purchaser, on terms acceptable to Purchaser in Purchaser's sole discretion (the "New GSA Lease").

(g)    Association Estoppel.  Seller shall have obtained and delivered to Purchaser an estoppel certificate from the Martin Downs Marina Village Association, Inc., and Marina Downs Property Owners Association, Inc. confirming that all outstanding assessments and maintenance fees have been paid and no default exists with respect to the Property under the applicable association documents.

5.2    Seller Conditions.  Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell the Property shall be subject to and contingent upon the satisfaction or waiver of the following conditions precedent:

(a)    Inspection.  The satisfaction of the condition set forth in Paragraph 5.1(a) above.

(b)    Performance. Purchaser's payment of the Purchase Price at Closing and the truth and accuracy of Purchaser's representations and warranties in this Agreement as of the Closing Date.

(c)    Bankruptcy Court Approval. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not have been modified, amended, rescinded or vacated in any material respect and shall not be subject to any stay pending appeal and (i) the time to appeal the Sale Order shall have expired; or (ii) the Sale Order shall have permitted the immediate closure of the sale and purchase of te Assets in accordance with Bankruptcy Rule 6004(h).

5.3    Failure or Waiver of Conditions Precedent. Either party may at its election, at any time or times on or before the date specified for the satisfaction of the condition, waive in writing the benefit of any of the conditions set forth in Paragraphs 5.1 and 5.2 above. In the event any of the conditions set forth in Paragraphs 5.1 or 5.2 are not fulfilled or waived, the party benefitted by such conditions may, by written notice to the other party, terminate this Agreement, whereupon all rights and obligations hereunder of each party shall be at an end except those that expressly survive any termination. Notwithstanding the foregoing, Purchaser's failure to terminate this Agreement prior to the expiration of the Due Diligence Period shall be deemed the complete and irrevocable satisfaction of the condition set forth in Paragraph 5.1(a) above, and Purchaser shall not thereafter be entitled to terminate this Agreement based upon the alleged failure of such condition. In the event this Agreement is terminated as a result of the failure of any condition set forth in Paragraph 5.1, Purchaser shall be entitled to a refund of the Earnest Money.

## ARTICLE 6: CLOSING

6.1    Closing. The consummation of the transactions contemplated herein ("Closing") shall occur on the Closing Date at the offices of the Escrow Agent or pursuant to escrow arrangements reasonably satisfactory to Purchaser and Seller. Upon completion of the deliveries pursuant to Paragraphs 6.2 and 6.3, satisfaction of the other conditions to Closing herein set forth and performance by each party of its obligations required to be performed prior to or at the Closing, the parties shall direct Escrow Agent to make such deliveries and disbursements according to the terms of this Agreement.

6.2    Seller's Deliveries in Escrow. On or before 1:00 PM Eastern Time on the Closing Date, Seller shall deliver in escrow to the Escrow Agent the following:

(a)    Deed. A special warranty deed (warranting title for acts by, through or under Seller) (the "Deed") in the form of Exhibit C attached hereto, executed and acknowledged by Seller, conveying to Purchaser Seller's title to the Property, subject to the Permitted Exceptions.

(b)    Assignment of Leases and Contracts and Bill of Sale. An Assignment of the Leases, the Contracts that Purchaser has elected to assume hereunder and the Intangible Personal Property, and Bill of Sale for the Personal Property in the form of Exhibit D attached hereto, executed by Seller (the "Assignment");

(c)    Vehicles. Florida Highway Safety and Motor Vehicle form 82042 and such other documentation as may be necessary to transfer title of the Vehicles to Purchaser;

(d)    FIRPTA. A Foreign Investment in Real Property Tax Act affidavit executed by Seller; and

(e)    Evidence of Authority. Documentation to establish to Title Company's reasonable satisfaction the due authorization of Seller's execution of this Agreement and the transaction and all documents contemplated by this Agreement.

(f)    Tax Clearance. A sales tax clearance certificate issued by the Florida Department of Revenue.

(g)    Rent Roll. A Rent Roll updated as of the Closing Date.

(h)     Additional Documents.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

6.3     Purchaser's Deliveries in Escrow.  On or before 1:00 PM Eastern Time on the Closing Date, Purchaser shall deliver in escrow to the Escrow Agent the following:

(a)     Purchase Price.  The Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, deposited by Purchaser with the Escrow Agent in immediate, same-day federal funds wired for credit into the Escrow Agent's escrow account.

(b)     Assignment of Leases and Contracts and Bill of Sale.  The Assignment executed by Purchaser.

(c)     Additional Documents.  Any additional documents that Escrow Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

6.4     Closing Statements/Escrow Fees.  At the Closing, Seller and Purchaser shall deposit with the Escrow Agent executed closing statements consistent with this Agreement in the form required by the Escrow Agent.

6.5     Post-Closing Deliveries.  Promptly after the Closing, Seller shall deliver to the Property or the offices of Purchaser's property manager: the original Leases and GSA Lease; originals of all contracts (or copies if no originals are available) and receipts for deposits; all keys, if any, used in the operation of the Property; and, if in Seller's possession, a copy of any "as-built" plans and specifications of the Improvements.

6.6     Notice to Tenants.  Seller and Purchaser shall deliver to each tenant immediately after the Closing a notice regarding the sale in substantially the form of Exhibit E attached hereto, or such other form as may be required by applicable state law.

6.7     Closing Costs.

Each party shall pay its portion of the following costs as indicated below:

(a)     Survey – Purchaser.

(b)     Owner 's Title Policy, exclusive of extended coverage and endorsements – Purchaser.

(c)     Extended coverage and endorsements for Owner 's Title Policy – Purchaser.

(d)     Documentary stamps on Deed imposed on the sale contemplated herein – Seller

(e)     Recording charges:

(i)     Instruments to remove encumbrances that Seller is obligated to remove – Seller.

(ii)    Deed – Purchaser

(f)     Other – The Escrow Agent's escrow fee shall be evenly divided between the parties.

Each party shall pay its own attorneys' fees. Any costs associated with any financing that Purchaser may obtain shall be borne solely by Purchaser. All other costs shall be borne according to local custom.

6.8     Close of Escrow.  Upon satisfaction or completion of the foregoing conditions and deliveries, the parties shall direct Escrow Agent to close this transaction by making disbursements according to the closing statements executed by Seller and Purchaser, and thereafter to record and deliver the documents described above to the appropriate parties.

ARTICLE 7: PRORATIONS

Prorations and adjustments with respect to each Property shall be made as of the Closing Date with respect to such Property as set forth in this Article 7.

7.1     Prorations. The day of Closing shall belong to Purchaser and all prorations hereinafter provided to be made as of the Closing shall each be made as of the end of the day before the Closing Date. In each such proration set forth below, the portion thereof applicable to periods beginning as of Closing shall be credited to Purchaser or charged to Purchaser as applicable and the portion thereof applicable to periods ending as of Closing shall be credited to Seller or charged to Seller as applicable.

(a)     Collected Rent. All collected rent and other collected income (and any applicable state or local tax on rent) under Leases ain effect on the Closing Date shall be prorated as of the Closing. Uncollected rent and other income shall not be prorated. Purchaser shall apply rent and other income from tenants that are collected after the Closing first to the obligations then owing to Purchaser for its period of ownership and to costs of collection, remitting the balance, if any, to Seller. Any prepaid rents for the period following the month including the Closing Date shall be paid over by Seller to Purchaser.

(b)     Taxes and Assessments. Real estate taxes and assessments imposed by governmental authority and any assessments imposed by private covenant constituting a lien or charge on the Property for the then current calendar year or other current tax period (collectively, "Taxes") shall be prorated. The applicable tax period for real estate taxes is the 2019 calendar year. Such proration shall be based upon the maximum discount available for early payment, and shall not be re-prorated based upon the property owner's actual date of payment. If the Closing occurs prior to the receipt by Seller of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, Purchaser and Seller shall prorate Taxes for such calendar year or other applicable tax period based upon the 2018 assessed value of the Property and most recently available tax rates, multiplied by 105%. Any refund or rebate of Taxes resulting from a tax abatement, or from a tax protest, challenge or appeal (an "Appeal") for a tax year ending prior to the Closing Date shall belong to Seller, whether received before or after Closing. Any refund or rebate of Taxes, less costs incurred in connection therewith, resulting from an Appeal for the tax year in which the Closing Date occurs shall be prorated between the parties as of the Closing Date, whether received before or after Closing, and Seller shall have the sole authority to prosecute any such Appeal, and after the Closing Date, Purchaser and Seller shall mutually cooperate in the prosecution of any such Appeal.

(c)     Utilities. Utilities, including water, sewer, electric, and gas, based upon the last reading of meters prior to the Closing shall be prorated. Seller shall endeavor to obtain meter readings on the day before the Closing Date, and if such readings are obtained, there shall be no proration of such items. Seller shall pay at Closing the bills therefor for the period to the day preceding the Closing, and Purchaser shall pay the bills therefor for the period subsequent thereto. If the utility company will not issue separate bills, Purchaser will receive a credit against the Purchase Price for Seller's portion and will pay the entire bill prior to delinquency after Closing. If Seller has paid any utilities in advance, then Purchaser shall be charged its portion of such payment at Closing.

(d)     Fees and Charges under Contracts, Licenses and Permits. Fees and charges under such of the Contracts, licenses and permits as are being assigned to and assumed by Purchaser at the Closing, shall be prorated on the basis of the periods to which such fees and charges under said Contracts, licenses and permits relate.

(e)     Work in Progress. Purchaser shall reimburse Seller on the Closing Date for Seller's direct cost of completed labor and parts installed, or materials used, or in the process of installation on any uncompleted repair orders in process ("WIP") for which on the Closing Date: (i) Seller possesses an initial open repair order signed by customer authorizing the repairs, and (ii) the customer transaction is arm's length. Such WIP shall become the property of Purchaser at Closing. Purchaser shall complete such WIP and shall be entitled to collect the outstanding balance of the proceeds covering such WIP from the customers of Seller (who then become customers of Purchaser after Closing). Within five (5) days prior to Closing, Seller shall provide a listing of its WIP to Purchaser and in addition, Seller shall attempt to minimize any WIP by utilizing reasonable efforts to complete same, return boats to customers, and obtain payment for the work prior to Closing. In the event a customer has prepaid for an uncompleted repair order, Purchaser's reimbursement shall either (a) be reduced by the amount of remaining WIP that Purchaser

10

shall be required to perform after Closing or (b) if Seller is not entitled to reimbursement, reduce the Purchase Price by the amount of pre-paid WIP.

(f)     Final Adjustment After Closing.  If final prorations cannot be made at Closing for any item being prorated under this Paragraph 7.1, then Purchaser and Seller agree to allocate such items on a fair and equitable basis as soon as invoices or bills are available and applicable reconciliation with tenants have been completed, with final adjustment to be made as soon as reasonably possible after the Closing but no later than 60 days after the Closing (except as to real estate taxes for 2019, the final adjustment with respect to which shall take place not later than 30 days after the later to occur of receipt of the trim notice or the final disposition of any Appeal thereof), to the effect that income and expenses are received and paid by the parties on an accrual basis with respect to their period of ownership.  Payments in connection with the final adjustment shall be due within 10 days of written notice.  The provisions of this Paragraph 7.1 shall survive Closing.

7.2     Deposits.  All tenant security deposits in Seller's possession, if any, under the GSA Lease and as reflected on the final Rent Roll delivered to Purchaser (and interest thereon if required by law or contract to be earned thereon), and not theretofore applied to tenant obligations under the Leases or the GSA Lease shall be transferred or credited to Purchaser at Closing or placed in escrow if required by law.  As of the Closing, Purchaser shall assume Seller's obligations related to such security deposits.

7.3     Sale Commissions.  Seller and Purchaser each represent and warrant to the other that it has not dealt with any real estate broker, sales person, consultant or finder in connection with this transaction other than GAB Enterprises ("GAB").  If any claim is made for broker's or finder's fees or commissions in connection with the negotiation, execution or consummation of this Agreement or the transactions contemplated hereby on behalf of, or by through or under either party, such party shall defend, indemnify and hold harmless the other from and against any such claim based upon any purported or actual statement, representation or agreement of such party. GAB will receive a consulting fee at Closing paid by Seller equal to 1.5% of $6,5000,000.00.

## ARTICLE 8: REPRESENTATIONS AND WARRANTIES

8.1     Seller's Representations and Warranties.  As a material inducement to Purchaser to execute this Agreement and consummate this transaction, Seller represents and warrants to Purchaser as of the date hereof and as of the Closing that:

(a)     Organization and Authority.  Seller has been duly organized and is validly existing as a limited liability company, in good standing in the State of Florida and is qualified to do business in the state in which the Property is located.  Seller has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action.  There is no agreement to which Seller is a party or to Seller's knowledge binding on Seller which is in conflict with this Agreement.  To Seller's knowledge, other than the Bankruptcy Case, there is no action or proceeding pending against Seller or the Property, including condemnation proceedings, which (i) challenges or impairs Seller's ability to execute or perform its obligations under this Agreement, or (ii) materially and adversely affects the Property and which is not covered by insurance.

(c)     Rent Roll and Operating Statements.  To Seller's knowledge, the Rent Roll is true, correct and complete in all material respects as of the date thereof.  Except for the Leases, there are no other leases or agreements of occupancy or contracts affecting the Property that will burden the Property and Purchaser after Closing.  The Financials were prepared by or for Seller in accordance with generally accepted accounting principles consistently applied in the ordinary course of its business and are used and relied upon by Seller in connection with its operation of the Property for the period indicated.  Seller does not possess any tenant's security deposits.

11

(d)     Contracts. To Seller's knowledge, each of the Contracts is true, correct, and complete as of the date of its delivery in all material respects. To Seller's knowledge, neither Seller, nor any other party, is in default under any Contract.

(e)     Compliance with Law. Seller is not in receipt of any written notice from any governmental authority or agency having jurisdiction over the Property, that the Property or its use is in violation of any law, ordinance, or regulation, and to Seller's knowledge, no such violation exists.

(f)     Employees. Seller does not have any employees.

(g)     Options. There are no rights of first refusal, options to purchase or other rights by any third party to acquire the Property or any interest therein.

(h)     Environmental. Seller has not received written notice from any person or entity of any violation of any Environmental Laws or the presence of Hazardous Materials at the Premises. For purposes of this Agreement (y) the term "Hazardous Materials" shall mean (a) any toxic substance or hazardous waste, hazardous substance or related hazardous material, or any pollutant or contaminant; (b) radon gas, asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or other equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of presently existing federal, state or local safety guidelines, whichever are more stringent; (c) any substance, gas material or chemical which is defined as or included in the definition of "hazardous substances," "toxic substances," "hazardous materials," "hazardous wastes" or words of similar import under any federal, state or local statute, law, code, or ordinance or under the regulations adopted or guidelines promulgated pursuant thereto, including, but not limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9061 et seq.; the Hazardous Materials Transportation Act, as amended, 49 U.S.C. §1801, et seq.; the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6901, et seq.; the Federal Water Pollution Control Act, as amended, 33 U.S.C. §1251, et seq.; and (d) any other chemical, material, gas, or substance, the exposure to or release of which is prohibited, limited or regulated by any governmental or quasi-governmental entity or authority that has jurisdiction over the Premises or the operations or activity at the Premises, and (z) the term "Environmental Laws" means all presently existing applicable present statutes, regulations, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, concessions, franchises, agreements and similar items, of or with any and all governmental agencies, departments, commissions, boards, bureaus or instrumentalities of the United States, states and political subdivisions thereof and all applicable judicial and administrative and regulatory decrees, judgments and orders relating to the protection of human health or the environment.

(i)     Personal and Intangible Property. The Inventory is true, correct and complete in all material respects and accurately reflects all of the personal property owned by Seller and used in connection with the ownership or operation of the Property. The Personal Property and the Intangible Personal Property is owned by Seller free and clear of all claims, liens and encumbrances whatsoever.

(j)     Submerged Land. None of the Land, including any portion of the Land that is submerged, is subject to a submerged land lease, uplands use agreement, easement or any other similar arrangement with the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida or any other governmental entity.

(k)     Yacht Brokerage. Seller does not hold title to, nor has taken consignment of, any vessels in connection with the yacht brokerage business conducted by Seller on the Property, and at Closing there are no brokerage or similar agreements that will be binding on Purchaser or the Property at Closing.

(l)     OFAC. Neither any Seller nor, to Seller's knowledge, any affiliates of any Seller, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

8.2    Purchaser's Representations and Warranties.  As a material inducement to Seller to execute this Agreement and consummate this transaction, Purchaser represents and warrants to Seller that:

(a)    Organization and Authority.  Purchaser has been or at Closing will be duly organized and is validly existing as a limited liability company, in good standing in the State of Florida.  Purchaser has the full right and authority to, and has obtained any and all consents required to, enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by Purchaser at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Purchaser, enforceable in accordance with their terms.

(b)    Conflicts and Pending Action.  There is no agreement to which Purchaser is a party or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement.  There is no action or proceeding pending or, to Purchaser's knowledge, threatened against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

(c)    OFAC.  Neither Purchaser nor, to Purchaser's knowledge, any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action.

## ARTICLE 9:  DEFAULT AND DAMAGES

9.1    Default by Purchaser.  If (i) Seller terminates this Agreement under Paragraph 11.1(b) or 11.1(c), (ii) at such time all conditions precedent to the obligations of Purchaser set forth in Paragraph 5.1 have been satisfied or waived in writing by Purchaser (or would have been satisfied except for the breach or failure of any of Purchaser's representations, warranties or covenants hereunder) and (iii) the Closing has not occurred solely as a result of the failure of Seller's conditions to Closing set forth in Paragraph 5.2(b), including, if and when required, Purchaser's obligations to consummate the transactions contemplated hereunder at Closing, then Seller shall be entitled, as its sole and exclusive remedy, to retain the Earnest Money as liquidated damages and not as a penalty.

9.2    Default by Seller.  If (i) all conditions precedent to the obligations of Seller set forth in Paragraph 5.2 have been satisfied or waived in writing by Seller (or would have been satisfied except for the breach or failure of any of Seller's representations, warranties or covenants hereunder) and (ii) the Closing has not occurred solely as a result of the failure of Purchaser's conditions to Closing set forth in Paragraph 5.1(b), then Purchaser shall be entitled to elect either (1) terminate this Agreement under Paragraph 11.1(d) or 11.1(e), receive the Earnest Money and reasonable expenses, or (2) not terminate this Agreement and pursue the remedy of specific performance of this Agreement; provided, however, in the event specific performance is not available due to the intentional actions of Seller, then Purchaser may pursue all available remedies at law or in equity; provided further, in the event Seller consummates a Competing Transaction (as hereinafter defined), specific performance shall not be available and Article 11 shall control.  Purchaser and Seller each acknowledge that as express consideration for entering into this Agreement and the representations, warranties and covenants set forth herein, each of Purchaser and Seller covenants and agrees that solely with respect to Purchaser's rights under this Paragraph 9.2, (A) Purchaser would be irreparably harmed by any breaches by Seller of its obligations to consummate the transactions hereunder as and when required by Seller hereunder, (B) monetary damages would not be a sufficient remedy for any violation of the terms of this Agreement with respect to Purchaser's rights under this Paragraph 9.2, (C) Purchaser shall be entitled to equitable relief, including injunction (without the posting of any bond and without proof of actual damages) and specific performance under this Paragraph 9.2, in addition to all other remedies available at law or in equity, including monetary damages, and (D) neither Seller nor any of its affiliates or representatives shall oppose the granting of specific performance or any such relief as a remedy with respect to Purchaser under this Paragraph 9.2 (it being understood that nothing in this clause (D) shall prevent Seller from challenging whether the condition described in Paragraph 9.2(b)(ii) has occurred).

9.3     Limitations.

(a)     Limitation Period.  Seller's warranties, representations and indemnities contained in this Agreement and in any document executed by Seller pursuant to this Agreement shall survive Purchaser's purchase of the Property for a period commencing on the Closing Date and ending on that date which is 1 year after the Closing Date (the "Limitation Period").

(b)     Disclosure.  Notwithstanding any contrary provision of this Agreement, if Seller becomes aware during the pendency of this Agreement prior to Closing of any matters which make any of its representations or warranties untrue in any material respect because of events that have occurred which are beyond Seller's control or because of new information of which Seller has become aware, Seller shall promptly disclose such matters to Purchaser in writing.  In the event that Seller discloses any material and adverse matters which make any of Seller's material representations and warranties untrue, Seller shall bear no liability for such matters (provided that such untruth is not the result of Seller's breach of any covenant set forth in this Agreement), but Purchaser shall have the right to elect in writing within five (5) business days of receiving written notice of such matter, but in no event later than the Closing Date, (i) to waive such matters and complete the purchase of the Property without reduction of the Purchase Price in accordance with the terms of this Agreement, or (ii) to terminate this Agreement and receive a return of the Earnest Money.

## ARTICLE 10: EARNEST MONEY PROVISIONS

10.1     Investment and Use of Funds.  The Escrow Agent shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Purchaser and Seller, shall not commingle the Earnest Money with any funds of the Escrow Agent or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made.  If the Closing under this Agreement occurs, the Escrow Agent shall apply the Earnest Money to the Purchase Price at Closing and deliver it to Seller.

10.2     Termination.  Except as otherwise expressly provided in this Agreement, upon not less than five (5) business days' prior written notice to the Escrow Agent and the other party, Escrow Agent shall deliver the Earnest Money to the party requesting the same; provided, however, that if the other party shall, within said five (5) business day period, deliver to the requesting party and the Escrow Agent a written notice that it disputes the claim to the Earnest Money, Escrow Agent shall retain the Earnest Money until it receives written instructions executed by both Seller and Purchaser as to the disposition and disbursement of the Earnest Money, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money to a particular party, in which event the Earnest Money shall be delivered in accordance with such notice, instruction, order, decree or judgment.

10.3     Interpleader.  Seller and Purchaser mutually agree that in the event of any controversy regarding the Earnest Money, unless mutual written instructions are received by the Escrow Agent directing the Earnest Money's disposition, the Escrow Agent shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money or, at the Escrow Agent's option, the Escrow Agent may interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Escrow Agent may recover all of its court costs and reasonable attorneys' fees.  Seller or Purchaser, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Escrow Agent, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

10.4     Liability of Escrow Agent.  The parties acknowledge that the Escrow Agent is acting solely as a stakeholder at their request and for their convenience, that the Escrow Agent shall not be deemed to be the agent of either of the parties, and that the Escrow Agent shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Seller or Purchaser resulting from the Escrow Agent's mistake of law respecting the Escrow Agent's scope or nature of its duties.  Seller and Purchaser shall jointly and severally indemnify and hold the Escrow Agent harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Escrow Agent's duties hereunder, except with respect to actions or omissions taken or made by the Escrow Agent in bad faith, in disregard of this Agreement or involving negligence on the part of the Escrow Agent.

ARTICLE 11:  RIGHT OF TERMINATION AND ABANDONMENT

11.1    Termination.  This Agreement may be terminated:

(a)    By mutual consent of Seller, on the one hand, and Purchaser, on the other hand;

(b)    By Seller, if through no fault of Seller, the Closing does not occur on or before 5:00 p.m. Eastern in Martin County, Florida on February 28, 2020 (the "Outside Date"), or as may be extended by mutual agreement of the Parties;

(c)    By Seller, if Purchaser has committed a material breach of this Agreement and such breach causes any of the conditions to closing set forth in Paragraph 5.2 not to be satisfied (or, if prior to Closing, such breach is of a magnitude or effect that it will not be possible for such condition to be satisfied), following written notice thereof from Seller to Purchaser; *provided, however,* that in the case of a breach that is capable of being cured, Purchaser shall have a period of fourteen business days following receipt of such notice to attempt to cure the breach and termination under this Paragraph 11.1(c) shall not become effective unless Purchaser fails to cure such breach prior to the end of such fourteen business day period; *provided, further,* if (i) Purchaser's conditions to Closing have been satisfied or waived (in writing) by Purchaser in full on or after the scheduled Closing Date, (ii) Seller is not in material breach of the terms of this Agreement, (iii) Seller notifies Purchaser in writing that Seller has performed or, absent such termination, is ready, willing and able to perform all of its agreements and covenants contained herein which are to be performed or observed at or prior to Closing, and (iv) Purchaser fails to consummate the Transaction within two business days of Seller's delivery of such notice, then such failure shall constitute a material breach of this Agreement that is not capable of being cured and this Agreement may be terminated by Seller upon the expiration of such two (2) business days period by notice to Purchaser.

(d)    By Purchaser if, through no fault of Purchaser, the Closing does not occur on or before the Outside Date.

(e)    By Purchaser, if Seller has committed a material breach of this Agreement and such breach causes any of the conditions to Closing set forth in Paragraph 5.1 not to be satisfied (or if, prior to Closing, such breach is of such a magnitude or effect that it will not be possible for such condition to be satisfied), following written notice thereof from Purchaser to Seller; *provided, however,* that in the case of a breach that is capable of being cured, Seller shall have a period of fourteen business days following receipt of such notice to attempt to cure the breach and the termination under this Paragraph 11.1(f) shall not become effective unless Seller fails to cure such breach prior to the end of such fourteen business day period; *provided, further,* if (i) Seller's conditions to Closing have been satisfied or waived (in writing) by Seller in full on or after the scheduled Closing Date; (ii) Purchaser is not in material breach of the terms of this Agreement; (iii) Purchaser notifies Seller in writing that Purchaser has performed or, absent such termination, is ready, willing and able to perform all of its agreements and covenants contained herein which are to be performed or observed at or prior to Closing; and (iv) Seller fails to consummate the Transaction within two business days of Purchaser's delivery of such notice, then such failure shall constitute a material breach of this Agreement that is not capable of being cured and this Agreement may be terminated by Purchaser upon the expiration of such two business day period by notice of Seller;

(f)    By Purchaser, if Seller's Bankruptcy Case is converted into a case under chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Bankruptcy Case;

(g)    Automatically, if a Competing Transaction is consummated.  "Competing Transaction" means any transaction (or series of transactions), whether direct or indirect, concerning a sale, merger, acquisition, issuance, financing, recapitalization, reorganization, liquidation, or disposition of Seller or any portion of its equity interests or all or substantially all of the assets thereof (in any form or transaction, whether by merger, sale of assets or equity or otherwise).  For clarification, a Competing Transaction includes a sale (whether the consideration of such Competing Transaction is cash, a credit bid, a combination of the foregoing, or otherwise) of the Property to someone other than Purchaser.

(h)    By Purchaser if the Bankruptcy Court shall have entered an order authorizing the consummation of a Competing Transaction.

(i)    By Purchaser or Seller, if the Sale Order is not entered by the Bankruptcy Court on or about January 31, 2020, based on Bankruptcy Court availability.

11.2    <u>Effect of Termination</u>

(a)    In the event of termination of this Agreement under <u>Paragraph 11.1(b)</u>, <u>11.1(d)</u>, <u>11.1(e)</u>, <u>11.1(f)</u>, <u>11.1(g)</u>, <u>11.1(h)</u>, or <u>11.1(i)</u>, Seller shall pay to Purchaser reasonable expenses within five (5) business days of demand following such termination and receipt of applicable invoices of Purchaser. The reasonable expenses shall constitute an administrative expense of Seller under section 503(b) and 507(a)(2) of the Bankruptcy Code.

(b)    Seller and Purchaser each acknowledge that the agreements contained in <u>Paragraphs 9.1</u>, <u>9.2</u> and this <u>Paragraph 11.2</u>, are an integral part of the transactions contemplated by this Agreement, that without these agreements such party would not have entered into this Agreement, and that any amounts payable under <u>Paragraph 9.1</u>, <u>9.2</u> and this <u>Paragraph 11.2</u> do not constitute a penalty. Seller and Purchaser agree that the payments set forth in this <u>Paragraph 11.2</u> will be deemed liquidated damages and that the amount of liquidated damages is reasonable considering all of the circumstances existing as of the Date of Agreement and constitute the Purchaser and Seller's good faith estimate of the actual damages reasonably expected to result from termination of this Agreement.

## ARTICLE 12: MISCELLANEOUS

12.1    <u>Parties Bound</u>. Neither party may assign this Agreement without the prior written consent of the other, and any such prohibited assignment shall be void. Notwithstanding the foregoing, Purchaser may assign this Agreement to an entity directly or indirectly controlled by, controlling or under common control with Purchaser ("<u>Assignee</u>"), without the prior written consent of Seller. In the event of such an assignment of this Agreement to Assignee (a) Purchaser shall notify Seller promptly, (b) Purchaser and Assignee shall be jointly and severally liable for all of Purchaser's liabilities and obligations under this Agreement, (c) Assignee shall assume all obligations of Purchaser under this Agreement, and (d) from and after any such assignment the term "Purchaser" in this Agreement (exclusive of this Paragraph 12.1) shall be deemed to mean the Assignee under any such assignment. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devisees of the parties

12.2    <u>Disclosures</u>. Prior to Closing, neither Seller nor Purchaser shall make any public announcement or disclosure of any information related to this Agreement to outside brokers or third parties without the prior written specific consent of the other; provided, however, that each of Seller and Purchaser may make disclosure of this Agreement to its lenders, servicers, creditors, officers, managers, potential lessees, members, employees and agents as necessary to perform its obligations hereunder or enter into leases of all or any portion of the Property continuing following the Closing Date, including, without limitation, by Purchaser in connection with the New GSA Lease. After Closing, either party may announce or disclose the fact that the transaction contemplated by this Agreement was closed, but neither party may disclose any specific information relating to the terms of this Agreement, including without limitation the Purchase Price or the identity of the other party, to outside brokers or third parties without the prior written specific consent of the other. In the event of a breach or threatened breach by Seller, Purchaser or their agents, consultants and/or lenders of this <u>Paragraph 12.2</u>, then in addition to any other remedy available hereunder the nonbreaching party shall be entitled to an injunction restraining the breaching party from disclosing, in whole or in part, such confidential information.

12.3    <u>Headings</u>. The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

12.4    <u>Invalidity and Waiver</u>. If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative. The failure by either party to enforce against

the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

12.5    Governing Law.  This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the State of Florida.

12.6    No Third Party Beneficiary.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

12.7    Entirety and Amendments.  This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Purchaser, which shall not be superseded by this Agreement.  This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

12.8    Attorneys' Fees.  Should either party employ attorneys to enforce any of the provisions hereof, the party against whom any final judgment is entered agrees to pay the prevailing party all reasonable costs, charges, and expenses, including attorneys' fees, expended or incurred in connection therewith.

12.9    Notices.  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Paragraph 1.1.  Any such notices shall be either (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (b) sent by email, with written confirmation sent the same day by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered upon transmission of such email, or (c) sent by personal delivery, in which case notice shall be deemed delivered upon receipt.  Any notice sent by email or personal delivery and delivered after 5:00 p.m., Martin County, Florida time, shall be deemed received on the next business day.  A party's address may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.  Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

12.10    Construction.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction — to the effect that any ambiguities are to be resolved against the drafting party — shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

12.11    Calculation of Time Periods.  Time is of the essence of this Agreement and all covenants and deadlines hereunder.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in the location where the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday.  The last day of any period of time described herein shall be deemed to end at 5:00 p.m., Martin County, Florida time.  Notwithstanding the foregoing, any deadlines requiring a Bankruptcy Court Motion and Hearing shall be modified to acknowledge Court availability and scheduling.

12.12    Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement.  To facilitate execution of this Agreement, the parties may execute and exchange by email delivery, in electronic PDF form counterparts of the signature pages.

12.13    **WAIVER OF JURY TRIAL.  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

12.14    <u>Section 1031 Exchange</u>.  At the request of either party, Purchaser and Seller agree to reasonably cooperate with the other and Escrow Agent in structuring and documenting the sale of the Property to effect a tax deferred exchange in accordance with the provisions of Section 1031 of the Internal Revenue Code and its corresponding regulations (a "1031 Exchange").  Such cooperation shall be at no cost or liability to the other party. In no event shall such cooperation require a delay of Closing.

*[Signature Page Follows]*

SIGNATURE PAGE TO
PURCHASE AND SALE AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year written below.

**SELLER:**

Meridian Marina & Yacht Club of Palm City LLC, a
Florida limited liability company

By:
Name: Timothy Mullen
Title: Managing Member
Dated as of:          11/23          , 2019

**PURCHASER:**

1400 Chapman, LLC, a Texas limited liability company

By:
Name: arun memarian
Title: President
Dated as of:     11/25     , 2019

**JOINDER**

The undersigned has executed this Agreement for the purposes of joining and agreeing to be bound by the express representations, warranties and indemnification obligations of Seller contained in this Agreement.

Tim Mullen

## JOINDER OF ESCROW AGENT

      Escrow Agent has executed this Agreement in order to confirm that Escrow Agent shall hold the Earnest Money in escrow, and shall disburse the Earnest Money pursuant to the provisions of Article 10 hereof.

Date: _Nov. 25_ , 2019

By: _____

Name: _Ria S. van Drigt_

Title: _Nat'l Comm Closer_

"Escrow Agent"

20

**EXHIBITS**

| | | |
|---|---|---|
| A. | - | Legal Description |
| B. | - | Inventory |
| C | - | Special Warranty Deed |
| D. | - | Assignment of Leases, GSA Lease and Contracts and Bill of Sale |
| E. | - | Notice to Tenants |
| F. | - | Rent Roll |

EXHIBIT A

**LEGAL DESCRIPTION**

The land and improvements at 1400 SW Chapman Way only.

A parcel of land lying in Government Lot 1, Section 7, Township 38 South, Range 41 East, and Government Lot 3, Section 8, Township 38 South, Range 41 East, Martin County, Florida. Being more particularly described as follows:

Begin at the South     t corner of the aforementioned Government Lot 1, said point also being the North line of Pelican Cove Subdivision, as recorded in Plat Book 2, page 96, Martin County, Florida, Public Records; thence North 89° 51' 38" West along said North line of Pelican Cove Subdivision, and the South line of said Government Lot 1, a distance of 1246.85 feet to a point on the East right of way line of Southwest Map Road (an 80.00 foot right of way); thence North 00° 27' 46" East along said East right of way line, a distance of 278.28 feet; thence South 48° 18' 28" East, a distance of 37.60 feet to the point of curvature of a curve, concave to the North, having a radius of 215.00 feet; the radius point of which bears North 07° 04' 43" West; thence Easterly along the arc of said curve, through a central angle of 07° 48' 35", a distance of 29.31 feet to the point of reverse curvature of a curve, concave to the South, having a radius of 77.50 feet; thence Easterly along the arc of said curve, through a central angle of 15° 01' 27", a distance of 28.32 feet to the point of reverse curvature of a curve, concave to the North, having a radius of 302.11 feet; thence Easterly, along the arc of said curve, through a central angle of 30° 01' 49", a distance of 158.34 feet; thence South 29° 53' 40" East, a distance of 50.00 feet; thence South 19° 48' 25" East, a distance of 95.39 feet to the Point of Curvature of a curve, concave to the Northeast, having a radius of 140.00 feet; thence Southeasterly along the arc of said curve through a central angle of 36° 44' 39", a distance of 89.78 feet to the point of tangency; thence South 89° 51' 38" East, a dist   ce of 287.99 feet; thence North 00° 08' 22" East, a distance of 125.00 feet; thence South 89° 51' 38" East, a distance of 580.00 feet; thence North 56° 26' 53" East, a distan    of 65.70 feet; thence North 28° 37' 30" West, a distance of 26.00 feet; thence North 61° 22' 39" East, a dist nce of 110.00 feet; thence North 78° 41' 06" East, a distance of 66.06 feet; thence North 39° 18' 00" East, a distance of 138.22 feet; thence South 14° 51' 07" East, a distance of 172.08 feet; th nce North 75° 08' 53" East, a distance of 56.00 feet; thence North 59° 07' 01" East, a dist nce of 55.47 feet; thence South 26° 44' 31" West, a distance of 213.91 feet; thence South 13° 43' 54" East, a di tance of 14.09 feet; thence South 20° 37' 11" West, a distance of 25.73 feet; thence South 14° 33' 09" West, a distance of 28.42 feet; thence South 09° 54' 13" West, a distance of 52.23 feet; than e  South 17° 06' 35" West, a dist nce of 14.33 feet; thence South 02° 53' 37" East, a distance of 12.58 feet; thence continue North 89° 51' 38" West, a distance of 199.04 feet to the Point of Beginning of the herein described parcel of land. a/k/a PLAT NO. 35 MARTIN DOWNS P.U.D., according to the plat thereof as recorded in Plat Book 11, page 25, Public Records of Martin County, Florida.

**EXHIBIT B**

**<u>INVENTORY</u>**

**EXHIBIT C**

<u>**FORM OF SPECIAL WARRANTY DEED**</u>

**EXHIBIT D**

**ASSIGNMENT OF LEASES AND CONTRACTS AND BILL OF SALE**

This instrument is executed and delivered as of the _____ day of _____, 2019 pursuant to that certain Purchase and Sale Agreement ("Agreement") dated _____ __, 2019, by and between _____ ("Seller"), and _____ ("Purchaser"), covering the real property described in Exhibit A attached hereto ("Real Property").

      1.      Sale of Personalty. For good and valuable consideration, Seller hereby sells, transfers, sets over and conveys to Purchaser the following (collectively, the "Personal Property"):

      (a)      Tangible Personalty. All of Seller's right, title and interest, if any, in and to all fixtures, furniture, equipment, and other tangible personal property owned by Seller presently located on the Land or used in connection with the Property, including, without limitation, all: (i) vehicles, including trailers, (ii) telephone systems and computer equipment, including software installed thereon, (iii) third party vendor parts and accessories located at the Property or in transit to the Property on the Closing Date and (iv) gasoline, motor oil, and other similar fuel and fluids currently stored on the Property.

      (b)      Intangible Personalty. All of Seller's right, title and interest, if any, in and to all of the following items: (i) licenses, permits and approvals relating to the ownership or operation of the Property, (ii) the right to use the name of the property, (iii) the right to use the marks identifying the Property, including, without limitation, "Meridian Marina & Yacht Club," (iv) all guaranties and warranties received by Seller from any contractor, manufacturer or other person in connection with the ownership or operation of the Property, (v) any domain names and web sites owned or used by Seller, (vi) Seller's lists of all tenants and customers of Seller and all corresponding service records for such tenants and customers, (vii) all plans and specifications related to the Property and (viii) all the goodwill of the business conducted by Seller on or about the Property.

      2.      Assignment of Leases and Contracts. For good and valuable consideration, Seller hereby assigns, transfers, sets over and conveys to Purchaser, and Purchaser hereby accepts the following (collectively, the "Assigned Property"):

      (a)      Leases. All of Seller's interest, as landlord, in the "Leases," being all leases, licenses and occupancy agreements relating to the Real Property, including all amendments thereto, as set forth on the rent-roll attached hereto as Exhibit B;

      (b)      Service Contracts and Commission Agreements. Seller's right, title and interest in and to the service contracts described in Exhibit C attached hereto (the "Contracts").

      3.      Assumption. Purchaser hereby accepts and assumes the liability and obligations of Seller under the Leases and Contracts arising from and after the date of this Agreement.

      4.      Agreement Applies. The covenants, agreements, disclaimers, representations, warranties, indemnities and limitations provided in the Agreement with respect to the Real Property are hereby incorporated herein by this reference as if herein set out in full and shall inure to the benefit of and shall be binding upon Purchaser and Seller and their respective successors and assigns.

      5.      Limitation of Liability. Notice is hereby given that all persons dealing with Seller shall look to the assets of Seller for the enforcement of any claim against Seller. None of the trustees, officers, directors, employees, members, owners, partners or shareholders of Seller shall have any personal liability for any of the liability or obligations of Seller.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have caused this instrument to be executed effective as of the date first written above.

**SELLER:**

_____

By:
Name:
Title:


**PURCHASER:**

_____


By: _____
Name: _____
Title: _____

**EXHIBIT E**

**NOTICE TO TENANTS**

[_____, 2019]

___

___

___

Dear Tenant:

Notice is hereby given to the tenants of _____ (the "Property") that _____, the current owner of the Property, has sold the Property to _____ ("Purchaser") effective _____, 2019.  As future payments under your lease should be made to _____ _____.

Very truly yours,

**SELLER:**

Date:   _____, 2019

**EXHIBIT F**

<u>Rent Roll</u>