UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                    CASE NO.:  19-18585-MAM

                                                          Chapter 11

MERIDIAN MARINA & YACHT CLUB
OF PALM CITY, LLC

      Debtor.

_____/

### MARTIN COUNTY MARINE HOLDINGS LLC'S
### OBJECTION TO DEBTOR'S DISCLOSURE STATEMENT (DE 74)

Martin County Marine Holdings., LLC's, ( "Marine Holdings")  a secured creditor

herein, through undersigned counsel, files this Objection to Debtor's Disclosure Statement (DE

74) and seeks a full disclosure of the status of Debtor's "protest" of the GSA lease award to

Windward Marina Stuart, LLC ( "Windward") and as grounds therefor states as follows:

1.        On June 27, 2019, (the "Petition Date") Meridian Marina & Yacht Club of Palm

City, LLC ( the "Debtor"), filed a voluntary petition under Chapter 11, Title 11 of the United

States Code.

2.        The Debtor is a Florida Limited Liability Company, and is successor by Merger

to the former Debtor,  Martin County Marine Corp., Case No. 12-11819- EPK,  and operates the

business known as Martin County, Marina.

3.        Marine Holdings, the secured creditor is a Florida Limited Liability Company

with offices in Orange County Florida. Marine Holding is a secured creditor by reasons of a note

secured by a first mortgage on all of the Debtor's real property and an Assignment of Rents

which are now reduced to a Default Final Judgment dated **December 18, 2018** in the amount of

$4,417, 341.17 which continues to bear interest at the prevailing statutory rate.

4.    The Debtor operates and manages a Marina on its real property which has fallen into disrepair.

5.    On or about January 10, 2020,  the Court approved the sale of the Debtor's real property to 1400 Chapman, LLC ("Purchaser") for the sum of $6,500,000.00 pursuant to a Purchase and Sale Agreement dated November 25, 2019 (" Purchase Agreement").  **Most importantly, the Purchase Contract is contingent on the Government Services Administration  ("GSA")  irrevocably committing to a lease with the Purchaser, on terms acceptable to the Purchaser,  in Purchaser's sole discretion.  See DE 52-1, page 7 of 28 , a copy of which is attached hereto as Exhibit A.**

6.    The initial due diligence period under the Purchase Agreement expired on
        January

 25, 2020 (60 days from the date of the Purchase Agreement which was executed 11/29/2019). The due diligence period was extended to April 30, 2020.

7.     Debtor has not disclosed to the Court and other creditors that (I)  the GSA lease has already been awarded to Windward , and (ii) the Purchaser and Debtor have each filed a protest of the award to Windward with the Government Accountability Office ("GAO") seeking to set aside that award.

8.    On  February 18,  2020 the GSA  filed a  Request for Summary Dismissal of the protest filed by Purchaser and Debtor, including a Memorandum of Law which is pending before the GAO. See **Exhibit B**, which is not a privileged document.

9.    Debtor has been claiming the sale of the marina  is "imminent"  from the

2

date of the entry of the Final Judgment of Foreclosure on December 18, 2018.

10.    The Final Judgment provided for a 90 day sale date of April 2, 2019, giving Debtor time to sell the marina.

11.    Debtor entered into a purchase and sale agreement with Winward Marina Group, LLC  dated February 21, 2019.  Windward intervened in the foreclosure action and requested an extension of the sale date since it was negotiating with the GSA for a new lease at the Marina, the Debtor's lease having been terminated.  The GSA lease was an integral part of the purchase by Winward Marina Group, LLC .  The state court extended the sale date until July 2, 2019. However, on June 27, 2019 the Debtor canceled the sale to Winward Marina Group,  LLC and filed for Bankruptcy protection.

12.    After terminating the lease with Debtor, the GSA sought applications for an appropriate marina (see GSA Memorandum attached) . After Debtor canceled the sale to Windward related to the Debtor's marina, Windward acquired another marina property and filed a new application with the GSA. On November 19,2019 Debtor entered into the Purchase Agreement with 1400 Chapman LLC, which requires Debtor's marina to have the GSA lease. Purchaser  1400 Chapman LLC filed its application with GSA, but on January 10, 2020 the lease was awarded to Windward, not 1400 Chapman LLC.

13.    On February 27, 2020, the Court entered an order approving the sale to  1400 Chapman LLC   based upon a purchase agreement requiring that the Debtor's marina have a GSA lease.  Debtor has failed to disclose to the Court and all creditors that the GSA lease was awarded to Windward.

14.    Rather than moving forward with a sale which is not contingent on a lease with

the GSA,  the Debtor has chosen to file its plan of reorganization based upon a sale which cannot

be consummated,  as the GSA lease has been awarded to Windward.

## MEMORANDUM OF LAW

Bankruptcy code Section 1125 (a) requires adequate information of a kind and in

sufficient detail to enable the creditors to make an informed decision as to whether to vote on the

plan. The Debtor in this case has failed to provide any detailed information to its creditors,

related to the status of the GSA lease which is a condition of the Purchase and Sale Agreement

which forms the basis for Debtor's Plan of Reorganization.  Debtor has been ordered to provide

this information to the Secured Creditor and has failed to provide any details as to the status of

the proceedings with GSA .  Undersigned counsel anticipates that the Debtor will argue that the

proceedings surrounding its protest are "confidential".  However, the Debtor failed to  request

confidentiality in the GSA proceeding as set forth in the document attached hereto as Exhibit B.

During the course of this proceeding, Debtor has maintained that there are other qualified

buyers who will pay over $6,000,000.00 for the Debtor's marina without the GSA lease

contingency.  Debtor should be required to disclose more detailed information regarding buyers

who do not require a GSA lease which would result in satisfaction of one hundred percent of

their claims much more quickly.

Prior to making a decision as to whether to vote on the plan and arguably before

approving the Purchase Agreement, the creditors and Court should have been informed that the

Debtor was proceeding with a sale requiring a GSA lease to be in effect, even though the GSA

lease was awarded to another marina and it would take a substantial amount of time and effort to

even create a possibility to close a the sale to 1400 Chapman LLC.

4

WHEREFORE the Debtor respectfully requests an Order requiring the disclosures as requested herein for such further relief as the Court deems just.

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by electronic mail to the Office of the United States Trustee on this 9th day of April, 2020, and that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1 (A).

SUSAN. LASKY, ESQUIRE
Attorney for Debtor
320 S.E. 18th Street
Fort Lauderdale, FL  33316
(954) 400 7474
Sue@SueLasky.com

By:  /S/ SUSAN D. LASKY
SUSAN D LASKY, ESQ.
Florida Bar No. 451096

# EXHIBIT "A"

For the purposes of this paragraph, the phrases "material damage", "materially damaged", "material portion", and "material taking" shall mean with respect to the Property (a) damage reasonably exceeding $50,000 to repair, or (b) taking of the Property which has a value reasonably exceeding $50,000.

## ARTICLE 5: CONDITIONS PRECEDENT

5.1     Purchaser's Conditions.  Notwithstanding anything in this Agreement to the contrary, Purchaser's obligation to purchase the Property shall be subject to and contingent upon the satisfaction or waiver of the following conditions precedent:

(a)     Inspection.  Purchaser's inspection and approval, in Purchaser's sole and absolute discretion, within the Due Diligence Period, of all matters relating to the Property, pursuant to Paragraph 2.2.

(b)     Performance.  Seller's performance of its obligations under this Agreement and the truth and accuracy of Seller's representations and warranties in this Agreement as of the Closing Date.

(c)     Casualty or Condemnation.  The Purchaser has not elected to terminate this Agreement pursuant to Paragraph 4.5.

(d)     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be a final order, not subject to appeal or a stay pending appeal, in full force and effect and shall not have been modified, amended, rescinded or vacated in any material respect.  "Sale Order" shall mean an order of the Bankruptcy Court that, among other things (i) finds that notice of the hearing concerning approval of this Agreement and the Transaction was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances; (ii) is not subject to a stay pending appeal; (iii) approves the Transaction contemplated by this Agreement and the terms and conditions hereof; (iv) is acceptable in form and substance to Purchaser and is not inconsistent with the terms of this Agreement; (v) finds that the Purchaser is a "good faith" Purchaser entitled to the protections afforded by section 363(m) of the Bankruptcy Code; (vi) provides that the Transaction is not subject to avoidance under section 363(n) of the Bankruptcy Code; and (vii) provides for the vesting of the Property in Purchaser free and clear of all liens, claims and encumbrances to the maximum extent permitted by section 363 of the Bankruptcy Code and applicable law.

(e)     Environmental Condition.  Seller shall have obtained and delivered to Purchaser a "no further action" letter reasonably acceptable to Purchaser from the applicable governmental authorities having jurisdiction over the Property with respect to the remediation and/or removal of the pre-existing underground storage tank at the Property. Seller will make best effort, however, is unlikely to receive a no further action by the closing date. Seller will agree to a reserve from closing proceeds of 150% of the estimated amount of closure costs from an environmental company, as determined by the parties during the Due Diligence Period.

(f)     New GSA Lease.  The GSA Lease shall have been terminated, and the GSA shall have irrevocably committed to enter into a new lease with Purchaser, on terms acceptable to Purchaser in Purchaser's sole discretion (the "New GSA Lease").

(g)     Association Estoppel.  Seller shall have obtained and delivered to Purchaser an estoppel certificate from the Martin Downs Marina Village Association, Inc., and Marina Downs Property Owners Association, Inc. confirming that all outstanding assessments and maintenance fees have been paid and no default exists with respect to the Property under the applicable association documents.

5.2     Seller Conditions.  Notwithstanding anything in this Agreement to the contrary, Seller's obligation to sell the Property shall be subject to and contingent upon the satisfaction or waiver of the following conditions precedent:

(a)     Inspection.  The satisfaction of the condition set forth in Paragraph 5.1(a) above.

7

# EXHIBIT "B"



GSA Office of General Counsel
Southeast Sunbelt Division
(404) 331-5105
FAX (404) 331-1231

February 18, 2020

**VIA EPDS**

Ms. Heather Weiner, Esq.
U.S. Government Accountability Office (GAO)
Attn:  Bid Protest Unit
441 G Street, NW
Washington, D.C. 205408

Re:    **B-418409.1 – Protest of 1400 Chapman LLC**
**Request for Summary Dismissal**
**Agency Report**

Dear Ms. Weiner:

    The U.S. General Services Administration ("GSA" or "Government") hereby submits a Request for Dismissal and the Agency Report in the above-referenced protest.

    The Report contains certain non-public information, proprietary, or source selection information that would ordinarily be subject to a Government Accountability Office (GAO) protective order. Because no protective order was issued in this protest, the agency submits its full report to GAO unredacted.

Sincerely,

Tammi Snyder Queen, Esq.
Assistant Regional Counsel
tammi.snyder-queen@gsa.gov

**U.S. General Services Administration**
77 Forsyth Street, SW
Atlanta, GA  30303-3458
www.gsa.gov

MEMORANDUM OF LAW
B-418401

## I.    INTRODUCTION

1400 Chapman, LLC ("Protester" or "1400 Chapman") challenges GSA's decision to award Request for Lease Procurement ("RLP") No. 6FL0513 to Windward Marina Stuart, LLC ("WMS" or "Intervenor").  GSA conducted the lease procurement on behalf of Customs and Border Protection (CBP), a federal agency that currently occupies 2, 185 RSF (1,900 ANSI/BOMA) space in Fort Pierce, FL under a lease that expires September 20, 2020.  The RLP was issued competitively in the Fort Pierce, Jensen Beach, Stuart, Palm City, and Port Salerno, FL market areas, with the goal of securing a new lease for CBP that would expand on its existing square footage and provide a 15 year firm term.  The approximate lease value is $5,398,920.

For the reasons stated herein, this protest by 1400 Chapman should be summarily dismissed. In the event the Government Accountability Office ("GAO") does not summarily dismiss the above-referenced protest as the Government and Intervenor have requested, then the protest should be denied on the merits.

## II.    PROCEDURAL HISTORY

Protester filed an initial protest on January 11, 2020, followed by three supplemental protests dated January 17, 19, and 23.  Protester, on January 31, used its Response to Intervenor's Request for Dismissal to assert additional new protest grounds. As described below, the Protester has used these various filings to develop its protest in piecemeal fashion, an approach which GAO has held impermissible. "GAO's regulations do not contemplate the piecemeal presentation or development of protest issues through later submissions proving alternative or more specific legal arguments missing from earlier general allegations of impropriety. Our Office will dismiss a protester's piecemeal presentation of arguments that could have been raised earlier in the protest process." Matter of: Interactive Info. Sols., Inc., B-415126.2 (Mar. 22, 2018), citing *Alfa Consult S.A.,* B–298164.2, B–298288, Aug. 3, 2006, 2006 CPD ¶127 at 3, n.2.

In addition, Protester filed letters from Tim Mullen on behalf of Meridian Marina & Yacht Club ("Meridian") on January 13 and 22.  Although Mr. Mullen is designated as a "secondary-representative" in EPDS, it is clear that Mr. Mullen represents the interests of Meridian, and not 1400 Chapman LLC.  These letters assert additional facts and arguments against the Government.  A timeline of submissions follows:

On January 11, 2020, Protester submitted its initial protest ("Initial Protest") alleging WMS, was not a qualified bidder because of its (1) ownership and affiliation with Stefan Johansson, whose personal tax issues should have made it ineligible; (2) lack of a SAM number, and (3) not meeting all of the RLP requirements, e.g. not having an on-site dock/boat slip. *See Initial Protest at 1.*

2

On January 13, 2020, Meridian Marina submitted a letter ("First Meridian Letter") to the GAO requesting to Intervene in the Protest. It restated the same facts Protester previously presented and added more facts. Meridian elaborated on Protester's Initial Protest arguing that Stefan Johansson's alleged federal tax lien makes the Windward Marina Group unqualified bidders and that a contract award to such an entity is illegal. *See First Meridian Letter at 1.*

On January 17, 2020, Protester submitted its first supplemental protest ("First Supplemental Protest"), wherein it acknowledged its receipt of the Government's January 16, 2020 written notice that it was not the successful offeror and thereby supplemented its Initial Protest contending (4) "that Ms. Lemus Toro advised us to increase our bid price as she felt our operating expense portion of the bid was too low," and (5) that the Phase I Environmental Report should have been acceptable. *See First Supplemental Protest at 1.*

It next filed a second supplemental protest dated January 19, 2020 ("Second Supplemental Protest"), where it expanded on its Initial and First Supplemental Protests by adding further information to advance its argument that the Government, and more particularly, the GSA Lease Contracting Officer ("LCO" or "contracting officer"), wrongly advised Protester to raise its bid price and (6) improperly continued to work with Stefan Johansson despite Protester's email notifying her of the Notice of Federal Tax Lien . *See Second Supplemental Protest at 1.*

On January 22, 2020, Protester submitted a second letter from Meridian ("Second Meridian Letter"), asserting additional grounds in support of the protest. Meridian argues (1) the Government's written notice to Protester was not done in accordance with FAR 14.409-1(a)(1)(i)(Award of Unclassified contracts)); (2) that FAR 15.306(b)(2) was violated by the Contracting Officer because of how the LCO allegedly advised Protester to raise its bid; (3) that FAR 9.406.2 was violated because the contracting officer continued to negotiate with Stefan Johansson; (4) that the CO engaged in bad faith because she revised the original RLP requirements for the benefit of WMS and engaged in favoritism; and (5) that the contracting officer violated FAR 15.306(e)(1) by prematurely notifying WMS of the Government's award decision. *See Second Meridian Letter at pp. 1-3.*

On January 23, 2020, in its third supplemental protest filing ("Third Supplemental Protest"), Protester asked GAO to reconsider its form of relief. Specifically, Protester requested the GAO order the Government to rescind the bid award, re-issue the RLP, and assign a new LCO, rather than rule in Protester's favor as it originally requested. *See Third Supplemental Protest at 1.*

On January 24, 2020, Intervenor filed a Request for Summary Dismissal ("Intervenor's Request for Summary Dismissal").

On January 27, 2020, Intervenor supplemented its Request for Dismissal ("First Supplement Request for Dismissal").

On January 31, Intervenor filed a second supplement to its Request for Dismissal ("Second Supplemental Request for Dismissal").

On January 31, 2020, Protester responded to Intervenor's Request for Summary Dismissal ("Fourth Supplemental Protest" or "Protester's Response to Intervenor's Request for Dismissal"). Protester then proceeded to add several new protest grounds, including: (7) the Government's written notice to Protester was untimely per FAR 15.503(b); (8) the market survey was flawed; (9) the price determination was based on the wrong award methodology (which Protester alleged was not lowest-price technically acceptable) and that the Government evaluated price by RSF rather than ABOA SF, contrary to the RLP; (10) that FAR 15.306(b)(2) was violated by the LCO when she allegedly caused Protester to materially alter its bid price (supplementing its prior supplemental protests), and (11) that the contracting officer's early notice of award to WMS showed inappropriate favoritism toward WMS. *See Protester's Response to Intervenor's Request for Dismissal, aka Fourth Supplemental Protest.*

On February 1, 2020, Protester filed an additional response to Intervenor's Second Supplemental Request for Dismissal ("Protester's Second Response to Intervenor's Request for Dismissal"), further denying Intervenor's bases for dismissal. *See Protester's Second Response to Intervenor's Request for Dismissal.*

On February 4, 2020, the GAO informed the parties it would stay its decision on the Intervenor's Request for Summary Dismissal until it heard from the agency.

On February 5, 2020, the Government requested an extension of time to file its Agency Report, which the GAO granted, extending the time for filing to February 18, 2020.

## III.   GROUNDS OF PROTEST

In an effort to address the myriad of submissions presented by Protester and Meridian in this protest, the Government has categorized the issues presented for response as follows: (A) Protester's Arguments (B) Meridian's Arguments and (C) New Protest Grounds as Set Forth in Protester's Response to Intervenor's Request for Dismissal. With respect Protester's arguments, it has presented the following issues:

### A.  PROTESTERS ARGUMENTS

1.  Whether WMS is a qualified bidder and eligible for award if it (a) is affiliated with Stefan Johansson, who received a Notice of Federal Tax Lien, (b) lacks a SAM number, and (c) fails to meet the RLP requirements of an on-site boat slip/dock? *See Initial Protest at 1.*

2.  Whether the LCO, acted in bad faith during the RLP process when the LCO allegedly caused Protester to increase its bid price. *See First Supplemental Protest at 1 and Second Supplemental Protest at 1-2.*

4

3. Whether Protester's Phase I Environmental Report should have been accepted because it was the same report accepted in a previous procurement. *See First Supplemental Protest at 1 and Second Supplemental Protest at 1-2.*

## B. MERIDIAN'S ARGUMENTS

Meridian, as the Protester's "secondary-representative" has advanced additional arguments:

1. Whether the Government's written notice to Protester was not done in accordance with FAR 14.409-1(a)(1)(i)(Award of Unclassified contracts).

2. Whether FAR 15.306(b)(2) was violated by the Contracting Officer because of how she allegedly advised Protester to raise its bid.

3. Whether FAR 9.406.2 was violated because the contracting officer continued to negotiate with Stefan Johansson after knowledge of a tax lien.

4. Whether the CO engaged in bad faith by revising its original RLP requirements for the benefit Stefan and, in turn, engaged in favoritism to the detriment of Protester.

5. Whether FAR 15.306(e)(1) was violated by the contracting officer when she notified WMS of the award decision on December 31, 2019.

The Government firmly asserts the GAO should dismiss all arguments advanced by Meridian and disregard its submissions. Meridian is <u>neither</u> the offeror <u>nor</u> the awardee and has no standing before the GAO in this matter.

## C. PROTESTER'S NEW PROTEST GROUNDS AS SET FORTH IN ITS RESPONSE TO INTERVENOR'S REQUEST FOR DISMISSAL

Finally, Protester concluded its piecemeal argument development by adding additional arguments in Protester's Response to Intervenor's Request for Dismissal. While GAO permitted the Protester to respond to Intervenor's Request for Dismissal, as supplemented, Protester took the opportunity to raise even more protest grounds. These additional issues include:

1. Whether the Government's written notice to Protester that it was not selected for award was untimely pursuant to FAR 15.503(b).

2. Whether the market survey was flawed resulting in bias against Protester (supplementing its prior bad faith allegations).

3. Whether the price analysis was based on the wrong award methodology, which Protester argues was not based on lowest-price technically acceptable and did not evaluate price per ABOA SF as required.

5

4. Whether FAR 15.306(b)(2) was violated by the LCO when the LCO allegedly caused Protester to materially alter its bid price (supplementing its prior supplemental protests).

5. Whether the LCO's early notice of award to WMS showed inappropriate favoritism toward the awardee (supplementing its prior bad faith allegations).

## IV.    STATUS OF CONTRACT PERFORMANCE

GSA has taken all necessary action to stay and suspend under the subject lease procurement in compliance with the provisions of the Competition in Contracting Act (CICA), 31 U.S.C. § 3553.[1]

## V.    AGENCY POSITION

As a preliminary matter, we believe the Protest should be dismissed because the grounds for protest are legally and factually insufficient; fail to state a cognizable protest ground; and/or are untimely.   On these arguments, the Government hereby adopts and incorporates by reference Intervenor's arguments in its January 24, 2020 Request for Dismissal, as supplemented on January 27 and 31.

Protester has failed to present any facts or legal bases that support its supposition that WMS is ineligible for award based on price or technical acceptability.   Consequently, Protester has no basis for relief and its protest should be dismissed for failure to provide a detailed statement of factual and legal grounds of protest as required by 4 C.F.R. §21.1(c)(4).

In the absence of dismissal, we believe the Protest should be denied, as all of Protester's grounds of protest are baseless and lack merit.   The facts and circumstances of the lease procurement firmly establish the Government properly selected WMS for award and that GSA acted in good-faith at all times, even allowing the Protester to participate in the competition when its proposal could have properly been not considered.   Protester did not present the lowest priced offer and has presented no evidence to the contrary.   Under the lowest-price technically acceptable (LPTA) award methodology, offerors must be both the lowest-priced and technically acceptable.   Even if Protester's allegations were viewed in the light most favorable to it, Protester cannot achieve the relief it seeks, as it was not the LPTA offeror.   Therefore, even if GSA committed an error, the Protester has not been prejudiced because it was not in line for award.

The relevant facts are set forth in the Contracting Officer's Statement of Facts ("COSF"), attached hereto. *See COSF.*

---

[1] In the course of preparing the Agency Report, GSA identified an issue relating to the signatory authority of the Contracting Officer on January 10, 2020, when the lease was signed. This defect can be readily resolved through action by the agency to, for example, re-sign the lease award form. GSA has not taken such action because it has stayed and suspended all action on the lease award in order to comply with CICA.

## A. GOVERNMENT'S RESPONSE TO PROTESTER'S ARGUMENTS.

**1. WMS was a qualified bidder and eligible for lease award because it (a) did not have a federal tax delinquency (b) was registered in SAM, and (c) met the RLP's requirements for a boat slip/dock.**

At the heart of Protester's initial protest filing are three assertions that WMS is not a qualified offeror[2] and therefore ineligible to receive a lease award. For all the reasons set forth below, and for all the reasons advanced by Intervenor in its January 24, 2020 Request for Dismissal, as supplemented on January 27 and 31, which the Government adopts herein and incorporates by reference, Protester's arguments fail.

(a) <u>Tax Lien Notice</u>. First, contrary to Protester's assertions, WMS[3] was not disqualified from offering due to its affiliation with Stefan Johansson, who was neither tax delinquent nor debarred for purposes of receiving a contract award, and therefore was qualified to offer. In fact, a tax delinquency for purposes of debarment and preclusion from contract award does not arise until a tax liability is finally determined and the taxpayer is delinquent in payment. *See* FAR 9.406-2(b)(v)(A)(1)-(2). In the instance of a Notice of Federal Tax Lien where the taxpayer is entitled to request a hearing and contest the lien, it is not a delinquent tax because it is not a final tax liability. *See* FAR 9.406-2(b)(v)(A)(2)(B)(2). Further, where the taxpayer has entered into an installment agreement and is in full compliance with the terms of that agreement, the taxpayer is not delinquent. FAR 9.406-2(b)(v)(A)(2)(B)(3).

In this case, on August 8, 2019, Tim Mullen of Meridian emailed the contracting officer a copy of a "Notice of Federal Tax Lien" for taxpayer Stefan Johansson dated April 12, 2018. *See COSF Paragraph 6. See also Initial Protest at 1 and First Meridian Letter at 1.* The email concluded that Stefan Johansson, who was and is Meridian's competitor (and once former business associate[4]), was not qualified to receive a federal government lease. The email, like this protest, provided no factual or legal basis to support its conclusion that Stefan Johansson was unqualified. Rather, it relied only on the existence of a year old tax lien notice and provided no present insight as to whether the tax matter may have been resolved or could have been under appeal by the time the email was sent to the contracting officer some 16 months later.

Despite having little facts to go on, the contracting officer did not ignore this information, but promptly looked into it by contacting Stefan Johansson to inquire about the Notice of Federal Tax Lien. *See COSF Paragraph 7.* At the time, August 2019, the Government was still in the market survey process and no solicitation had been issued. *See COSF Paragraph 5 and 8.* Mr.

---

[2] Throughout its protest, Protester uses the terms "bid" and "bidder," which are terms associated with FAR Part 14 - sealed bidding and Invitations for Bid (IFB's). As this was a FAR 15 negotiated procurement, the terms "offer" and "offeror" will be used throughout the remainder of this Memorandum of Law.

[3] The tax argument Protester advances concerns Stefan Johansson, an individual. Based on our review of Protester's argument, it appears he is arguing that Mr. Johansson's personal income tax issues for which he was notified in 2018 should foreclose any of his associated businesses from being eligible to bid on a 2019 federal government lease. With that understanding, the Government defends against the tax issue argument by referring to WMS, the selected awardee and a business with which Mr. Johansson is associated.

[4] *See Initial Protest at 1* ("Stefan Johansson of Windward Marina Group agreed to purchase Meridian Marina . . .").

7

Johansson informed the contracting officer that he presented an Offer in Compromise (OIC) to the IRS in September 2018, as explained in Intervenor's Request for Dismissal, and that the tax issue was being resolved through an installment payment plan. *See COSF  Paragraph 7 and Intervenor's Request for Dismissal at p8.*  Accordingly, there was no reason for the contracting officer to disqualify Mr. Johansson based on delinquent federal taxes.

Furthermore, it should be noted that Protester's allegations specifically concern the personal federal income tax issues of Stefan Johansson, not WMS, the selected awardee. Protester is arguing that Stefan Johansson's personal income tax issues should be imputed to WMS such that WMS should be disqualified through association (and that Stefan Johansson should have no role, managerial or otherwise, over WMS.) As established above, Protester's assertions are factually inaccurate. Because there is no tax delinquency, we believe the question of whether a personal tax debt may be imputed to a limited liability corporation need not be addressed.

**(b) SAM Registration**.  Next, Protester alleges that as of January 11, 2020, WMS did not appear to have an active SAM registration and that the Protester had met this criterion. *See Initial Protest at pp. 1-2.*  Protester is incorrect as to WMS, which had an active registration in SAM. It is also incorrect as to its own compliance with this requirement. RLP 6FL0513 v.3 section 3.05(H), required offerors to have an active  SAM registration prior to final proposal revisions. *See COSF Paragraph 20 and AR Exhibit 1 at section 3.05(H).*  Final proposal revisions were due November 7, 2019. *See COSF Paragraph 20.*  WMS was registered in SAM as of October 24, 2019 and was active as of November 7, 2019. *See id. and see Intervenor's Request for Dismissal at Exhibit B.*  Protester, on the other hand, was not active until November 20, 2019, nearly two weeks after final proposal revisions were due. *See COSF Paragraph 20 and AR Exhibit 6.*  SAM registrations are visible to the contracting officer and, as Intervenor explained on page 9 of its January 24, 2020 Request for Dismissal, WMS opted out of having its registration visible by the public. It is for this reason Protester cannot view WMS' SAM registration; not because WMS was not registered. Protester failed to timely comply with the requirement for SAM registration. WMS, however, was eligible for award, having satisfied this requirement.

**(c) RLP Requirement for boat slip/dock**.  Lastly, Protester contends WMS is ineligible to receive award because it does not meet the requirements of the RLP 6FL0513 v.3,[5] namely that it does not have an on-site boat slip/dock. *See Initial Protest at p2.*  This is false. RLP 6FL0153 v.3 was distributed on September 19, 2019 with Amendment #2 attached establishing October 21, 2019 as the offer due date. *See COSF paragraphs 8 and 9, and AR Exhibits 1 and 2.*  The Amendment #2 changed the Agency Special Requirements, including the boat slip requirement, among other changes. *See AR Exhibit 2.*  RLP 6FL0153 v.3 was distributed on September 19, 2019 to those parties that had expressed interest in the solicitation. *See COSF Paragraph 8.*  At that time, Protester had not expressed interest in RLP 6FL0513 v.3 or otherwise requested a copy

---

[5] For clarification, the RLP submitted by Intervenor in its Second Supplemental Protest at Exhibit B was a previous version of the RLP.  The correct version of RLP 6FL0513 v.3 is the one attached to the COSF as Exhibit 1 and to Protester's Response to Intervenor's Request for Dismissal at Exhibit B.  Both copies reflect the same award methodology of LPTA, as Intervenor identified in its Third Supplemental Protest dated January 31, 2020, pp 4-5.

of the RLP from the contracting officer. Thus, Protester was not distributed a copy of RLP 6FL0153 v.3 with Amendment #2. *See COSF Paragraphs 8, 9 and 12.*

In fact, Protester did not express interest in the RLP until three days after offers were due, October 24, 2019. *See COSF paragraphs 15, 16 and 17.* While the LCO could have rejected Protester's expression of interest as untimely, she permitted it and allowed the protester to compete in order to promote competition. *See COSF paragraph 5.* Therefore, on October 25, 2019, four days after initial offers were due, the contracting officer invited Protester to join the competition and distributed to him a copy of the RLP 6FL0513 v.3. *See COSF Paragraphs 8 and 18.* By this time, the RLP 6FL0513 v.3 included Amendment #3, which replaced the changes in Amendment #2 and corrected a clerical error. *See COSF paragraphs 9, 10, 11, 12, 13 and 18 and AR Exhibit 3.*

Once Protester received the RLP 6FL0513 v.3 from the LCO, on October 25, 2019, he was on express notice that the Agency Special Requirements required a boat dock/slip either on-site <u>or within five miles</u> of the location. *See COSF paragraph 18 and AR Exhibit 5.* He was also advised that any previous versions of the RLP for this procurement had been deleted in their entirety. *See COSF Paragraphs 9, 10, 11 and 12 and 18 and AR Exhibit 5.*

In fact, three separate sections of the RLP identified the boat slip requirement (Section 1.04(A), and Pages 1 and 14 of the Agency Special Requirements). While the contracting officer amended the first two sections to correctly reflect the changed requirement to be onsite or within five miles of the offered property, she neglected to update page 14 of the Agency Special Requirements. *See COSF Paragraphs 9, 10, and 11.* Conveniently, page 14 is <u>the only page</u> Protester furnished to the GAO to show the requirement. *See Initial Protest at Exhibit 4.* Protester further failed to disclose to the GAO that page 14 of the Agency Special Requirements had been corrected by the LCO through Amendment #3 dated October 17, 2019, which Protester received on October 25, 2019 and which he signed and returned. *See COSF Paragraphs 9, 10, 11, 12 and 18 and AR Exhibit 4.* In turn, Protester's argument that WMS is unqualified because it does not meet a requirement for an on-site boat slip/dock lacks merit.

Protester next raised two new grounds for protest in its supplemental filings dated January 17 and 19, respectively. In these supplemental protests, Protester argued: (2) that the contracting officer inappropriately advised it to increase its bid price, thereby manipulating the bid process (i.e. bad faith), and (3) that the Environmental Report should have been acceptable since it was the same report Meridian submitted in the previous lease procurement that the contracting officer accepted. Each will be addressed in turn.

## 2. The Government acted in good faith throughout the RLP process and Protester has failed to establish irrefutable proof to the contrary.

Initially, it should be established that the Protester has not directly alleged bad faith as a protest ground. Instead, the Government has interpreted its muddled allegations to be ones grounded in bad-faith, as Protester has alleged the contracting officer advised it to "increase its bid price," and "manipulated" and "compromised the bid process," showing "favoritism" to

WMS, and thereby establishing a "significantly flawed RLP process." *See Protester's Second Supplemental Protest at 1 and Third Supplemental Protest at 1-3.* Accordingly, the Government defends based on these collective allegations of bad-faith.

To establish the Government acted in bad faith, Protester must prove its allegation by clear and convincing evidence, as government officials are presumed to be acting in good faith without indisputable proof to the contrary. *See BAE Sys. Tech. Solutions & Servs., Inc.,* B-409914, B-409914.2, Sept. 16, 2014, 2014 CPD ¶322 at 11 ("Government officials are presumed to act in good faith, and a protester's contention that procurement officials are motivated by bias or bad faith must be supported by convincing proof; our Office will not consider allegations based on mere inference, supposition, or unsupported speculation.") cited by *Hewlett Packard Enter. Co., B-413444.4; B-413444.5, Jan. 18, 2017, 2017 CPD ¶ at 7n.5;* See also *GE Government Services, Inc. v. U.S.,* 788 F. Supp. 581, 590-591, 37 Cont. Cas. Fed. (CCH) P 76300 (D.D.C. 1992) citing *Howard Cooper Corp. v. U.S.,* 763 F. Supp. 829, 37 Cont. Cas. Fed. (CCH) P 76169 (E.D. Va. 1991)("For a disappointed bidder to succeed on a claim that it was denied fair treatment because of bias, [ ], the bidder must establish the existence of bias by well-nigh irrefragable proof.")

Such proof is distinct from mere conjecture and is the equivalent of evidence of a specific intent to injure. *See J. Carver Enters.,* B-227359, Sept. 3, 1987, 87-2 CPD ¶ 220 citing *Kalvar v. United States,* 543 F.2d 1298, 1301 (Ct.Cl.1976) (". . . there must be irrefutable proof that an agency has a malicious and specific intent to injure a protester before we may presume bad faith.") *See also Delta Data Sys. Corp.,* B-213396, Apr. 17, 1984, 84-1 CPD ¶ 430 (quoting *Kalvar Corp. v. U.S.,* 543 F.2d 1298, 1301 (Ct. Cl. 1976)("the record must show 'well-nigh irrefragable proof' that the agency had a malicious and specific intent to injure the party alleging bad faith.") and *Am-Pro Protective Agency, Inc. v. United States,* 281 F.3d 1234 (Fed. Cir. 2002)(equating well-nigh irrefragable proof to clear and convincing evidence). To rebut a showing of bias, procuring agencies can proffer a reasonable explanation for its actions. *See* Protest of *SMS Data Products Group, Inc.,* G.S.B.C.A. No. 10587-P, 90-3 B.C.A. (CCH) ¶ 23034, 1990 WL 75603 (Gen. Services Admin. B.C.A. 1990) citing *CACI, Inc.- Federal v. United States,* 719 F.2d 1567, 1579 (Fed.Cir.1983).

In this case, nothing Protester has submitted meets this high standard. Rather, Protester predicates its theory of bias and bad faith on supposition and conjecture, not indisputable proof. Protester's assertion that the contracting officer advised it to increase its bid price is wrong and the Government denies Protester's assertion. In fact, the exhibits Protester attached to its Third Supplemental Protest, particularly Exhibit 2, evidence Protester's deficiencies in its initial offer through its Form 1364 (dated 10.21.2019) and Form 1217 (dated 10.29.19). Rather than bad faith, the LCO's actions indicate a willingness to allow Protester to correct deficiencies and continue to participate in the procurement, as reflected in Protester's Exhibits 3 and 4. *See Third Supplemental Protest at Exhibits 2-4. See also COSF paragraphs 22, 23 and 24.*

With regard to the Form 1364, Protester erroneously calculated the annual rent per RSF at $50.70 (row 18, column d) and the annual rent per ABOA SF as $58.05 (row 18, column e). *See Third Supplemental Protest at Exhibit 2, GSA Form 1364, Row 18, columns d and e. See also*

*COSF paragraphs 22, 23 and 24.* However, based on the numbers in that form, the correct calculation is $53.96 per RSF (Dividing total annual rent/sf found in row 19, column d by the RSF found in line 10, i.e. $437,119.20 / 8100 = $53.96) and $61.78 per ABOA SF (dividing the total annual rent per ABOA found in row 19, column e, by the ABOA SF found in Line 9, i.e. 437,152.95 / 7075 = $61.78). In other words, <u>Protester never had an initial offer price as low as $50.70/RSF as it contends</u>; it miscalculated its initial figures. It also incorrectly set the common area factor in Line 11 at 7% when, in fact, it was 14%, correction it was later allowed to make in its final offer. *See Third Supplemental Protest at Exhibit 2, Form 1364 Line 11, and Exhibit 4, Form 1364, Line 11. See also COSF paragraph 23.*

The Form 1217 had similar computational errors and omissions. Lines 10 and 18 were left blank without reference to whether Protester captured these costs elsewhere and lines 6, 7, 12 and 13 appeared to reflect monthly amounts, not annual costs, contrary to the form's purpose. *See Third Supplemental Protest, Exhibit 2, GSA Form 1217. See also COSF paragraph 23.* As a result, the contracting officer brought these computational errors to the attention of Protester during discussions so he could correct his miscalculations and double-check his prices to ensure he was providing annual costs, not monthly. *See COSF paragraphs 22, 23 and 24.* At the time she brought these issues to his attention, Protester informed the contracting officer that it had not yet received its quote from its subcontractor for pricing. *See COSF paragraph 24.* Through its own statement, Protester recognized its initial offer prices were inaccurate and needed revised.

Accordingly, following their conversation and after Protester received its subcontractor pricing, Protester submitted corrected forms 1364 and 1217, as reflected in its Exhibit 3 from its Third Supplemental Protest. *See Third Supplemental Protest at Exhibit 3.* It then submitted its final offer on November 7, 2019, following the LCO's request for FPR's which noted some of those very issues as items for discussion. *See COSF Paragraph 26 and AR Exhibit 7, rows 1 and 2.* Protester's final offer reflected a final cost of $55.71 per RSF (only $1.75 cents more than its initial offer, not the $5.01 Protester alleges), as referenced in its Exhibit 4. *See Third Supplemental Protest at Exhibit 4; See also COSF paragraph 26 and AR Exhibit 7.* Its final offer reflects how Protester corrected its errors and omissions; it does not establish bad faith by the Government and in no way meets a clear and convincing evidence standard. Nor do Protester's allegations establish that the LCO engaged in favoritism or manipulated the procurement process. In fact, at no time did the LCO ever instruct Protester to increase its bid price. *See COSF Paragraph 25.* Rather, the actions the LCO took were grounded in good faith and, if anything, inured to the Protester's benefit. For those reasons, Protester's argument that the LCO manipulated the bid process or otherwise acted in bad faith is seriously flawed and lacks merit.

**3. Protester was technically unacceptable based on its Phase I Environmental Report, and even if it was technically acceptable, it would still be ineligible for award because it is not the lowest-priced offer.**

We disagree with the Protester that it was technically acceptable based on the Phase I Environmental Site Assessment (ESA) it submitted. However, even if it was technically acceptable, Protester is still ineligible to be selected for award because of price. Accordingly, it has suffered no prejudice justifying the relief it seeks. *See Gemini Laminating Corp. et al.,*

11

B-245223, Dec. 23, 1991, 91-2 CPD ¶ 573 ("Prejudice is an essential element of a viable protest, and where no prejudice is shown or is otherwise evident, our Office will not sustain a protest, even if a deficiency in the procurement is evident.")

As Protester shows the GAO through its Third Supplemental Protest, Exhibit 4, its final offered price of $55.71/RSF and $63.78/ABOA SF was higher than that of WMS. *See Third Supplemental Protest, Exhibit 4*, GSA Form 1364, row 18, columns d and e, and Exhibit 1. WMS offered a final price of $49.99/RSF and $50.87/ABOA SF. *See COSF Paragraph 31 and Third Supplemental Protest, Exhibit 1*. Based on the award methodology outlined in RLP 6FL0513 v.3, Protester is simply not the lowest priced offeror. Therefore, even if the Phase I Environmental Report it submitted made it technically acceptable, Protester remains ineligible for award because of price.

Finally, Protester alleges that because it submitted the same Phase I ESA in its proposal as the Phase I ESA submitted by Meridian in a prior procurement, its submission should have been accepted. *See First and Second Supplemental Protests*. This protest ground is without merit. As the Contracting Officer explains in paragraph 4 of her COSF, Meridian was awarded a lease under a separate procurement and its lease was later terminated for default. *See COSF Paragraph 4*. This lease procurement is wholly independent. GAO has long held that each procurement stands on its own. The fact that an offered product may have been accepted under a prior procurement is irrelevant to the determination of whether the product was properly rejected under the current procurement; each procurement stands on its own. Discount Mach. & Equip., Inc., B-230567, May 2, 1988, 88-1 CPD ¶ 422. Disc. Mach. & Equip., Inc., B-248321 (July 22, 1992). Therefore, Protester's reliance on a prior lease procurement to claim disparate treatment now is without basis.

## B. GOVERNMENT'S RESPONSE TO MERIDIAN'S ARGUMENTS

The Government hereby objects to all submissions from Meridian and hereby requests the GAO disregard its submissions dated January 13 and 22. GSA further requests it remove Meridian and Robert Lewis, Meridian's counsel, as Protester's "secondary-representatives." Meridian is using its secondary-representative role to be a secondary protester to represent its own interests, which is not permitted by GAO's bid protest procedures. Meridian has no standing to intervene in this matter and its submissions should be excluded from the record.

Meridian is neither the offeror, the awardee, nor the intervenor and therefore lacks standing to present protest arguments against the Government. *See* 4 C.F.R. 21.0 (identifying "interested parties" as "an actual or prospective bidder or offer. . ." and "intervenor" as "an awardee if the award has been made or, if no award has been made, all bidders or offerors who appear to have a substantial prospect of receiving an award if the protest is denied.") *See also* 31 U.S.C.A. § 3551(2), and *Galen Medical Associates, Inc. v. U.S.*, 2003, 56 Fed.Cl. 104, affirmed 369 F.3d 1324, rehearing denied (explaining that to have standing a plaintiff must be an interested party, which is "limited to actual or prospective bidders or offerors.") In fact, the January 13, 2020 letter it submitted to the GAO represented its "formal request to intervene," which it later withdrew, through its counsel, Robert M. Lewis, on January 21,

2020. Therefore, its January 13 submission documenting its formal Request to Intervene and presenting argument in protest of the selected awardee is moot, as it was self-withdrawn by Meridian and deserves no response from the Government.

With respect to Meridian's January 22, 2020 submission, this was submitted one day after Meridian withdrew its January 13, 2020 Request to Intervene. Obviously, once Meridian realized it could not intervene, both Meridian and its counsel, Robert M. Lewis, re-labeled themselves as "secondary-representatives" of Protester in order to tack on additional protest arguments against the Government as though they were qualified intervenors or the Protester. Such tacking and piecemeal development of protest arguments is in direct contravention to the established practices of the GAO. *See Matter of: Interactive Info. Sols., Inc.*, B-415126.2 (Mar. 22, 2018), citing *Alfa Consult S.A.*, B-298164.2, B-298288, Aug. 3, 2006, 2006 CPD ¶127 at 3, n.2 ("GAO's regulations do not contemplate the piecemeal presentation or development of protest issues through later submissions proving alternative or more specific legal arguments missing from earlier general allegations of impropriety. Our Office will dismiss a protester's piecemeal presentation of arguments that could have been raised earlier in the protest process.")

The role of a secondary-representative is intended to be and should be reserved for Protester's legal counsel. Protester, of course, is unrepresented by legal counsel. Therefore, Meridian and its attorney, Robert Lewis, should not be permitted to use the status of "secondary-representative" as a means to evade GAO's bid protest regulations and back-door in additional protest arguments against the Government for which they would not otherwise be entitled to assert. In this capacity, Meridian and its counsel have abused the role of a "secondary-representative," cloaking themselves in a convenient label to attempt to intervene where they are not otherwise qualified per 4 C.F.R. 21.0(a)-(b).

To the extent the January 22 submission is not dismissed as requested above, then it should be dismissed as untimely in accordance with 4 C.F.R. § 21.2(a)(2)("Protests . . . shall be filed no later than 10 days after the basis of protest is known or should have been known (whichever is earlier). . .") All of the grounds raised for protest in Meridian's January 22, 2020 submission were known or should have been known as of January 11, 2020. Accordingly, its January 22, 2020 submission, which was received after 10 days, is untimely and must be dismissed.

In the event the GAO does not find moot or dismiss Meridian's submissions as the Government requests, then the Government hereby adopts and incorporates by reference Intervenor's January 24, 2020 Request for Dismissal, as supplemented on January 27 and 31, in response to the allegations Meridian lodges against GSA.

## C. GOVERNMENT'S RESPONSE TO PROTESTER'S NEW PROTEST GROUNDS

Through its response to Intervenor's Request for Summary Dismissal, Protester raised additional grounds for protest. These should be dismissed as untimely in accordance with 4 C.F.R. § 21.2(a)(2), for the same reasons as set forth above in section C (Government's Response

to Meridian's Arguments). Protester knew of these new grounds for protest at the time it lodged its initial protest on January 11, 2020. The purpose of Protester's response to Intervenor's Request for Dismissal should have been to actually respond to the bases for dismissal Intervenor set forth. It was not and should not have been intended to give Protester yet another opportunity to create new protest grounds against the Government. Yet, that is precisely what Protester did; again, piling on in piecemeal fashion, arguments for which it expects Government Response.

As explained above, such piecemeal development of protest arguments is expressly disallowed. *See Matter of: Interactive Info. Sols., Inc.*, B-415126.2 (Mar. 22, 2018), citing *Alfa Consult S.A.*, B-298164.2, B-298288, Aug. 3, 2006, 2006 CPD ¶127 at 3, n.2. For all of these reasons, no further response from the Government is warranted.

VI.   **CONCLUSION**

For the foregoing reasons, all protests grounds should be dismissed. Alternatively, if the GAO determines that some or all of the protest grounds should proceed, then those grounds should be denied on the merits for all of the reasons set forth herein.

Sincerely,

Tammi Snyder Queen
tammi.snyder-queen@gsa.gov

14

## CONTRACTING OFFICER'S STATEMENT OF FACTS
### PROTEST OF 1400 CHAPMAN LLC, B-418409

1. My name is Milagros (Millie) Lemus Toro and I am the Lease Contracting Officer (LCO) at the General Services Administration (GSA) assigned to RLP 6FL0513 v.3.

2. On January 10, 2020, I notified Windward Marina Stuart, LLC that it was selected as the awardee under RLP 6FL0513 v.3 for 7,075 ABOA Square Feet of space (7,200 Rentable Square Feet (RSF)) at 612 SW Federal Highway in Stuart, FL for occupancy by the U.S. Customs and Border Protection (CBP), a federal agency, for a term of 15 years firm with no options.

3. CBP is currently occupying leased space in Fort Pierce, FL under a lease that expires on September 20, 2020.

4. I first began working on RLP 6FL0513 in 2017. At that time, I prepared RLP 6FL0513 v.1 and awarded LFL00191 v.1 to Meridian Marina & Yacht Club of Palm City, FL in November 2017. The Lease was terminated for default in March 2019. The subject lease was in default in accordance with the General Clauses, GSA Form 3517B, Clause 10. Because of the default, I re-initiated the lease procurement process for CBP in 2019 designating it as RLP 6FL0513 v.3. Version 3 reflected the current Agency Special Requirements (ASR). *See AR Exhibit 1.*

5. I endeavored to have a very competitive procurement for RLP 6FL0513 v.3. For example, the delineated area was expanded twice to increase competition. In between March 2019 – August 2019, I conducted market research and placed advertisements. At all times, I tried to ensure this procurement was as competitive as possible.

6. In August 2019, before I distributed solicitations for RLP 6FL0513 v.3, I received an email from Tim Mullen of Meridian Marina & Yacht Club of Palm City LLC transmitting a copy of a Notice of Federal Tax Lien for Stefan Johansson. The Notice was dated April 12, 2018. *See Initial Protest at Exhibit 1. See also First Meridian Letter at Exhibit 1.*

7. Upon receiving this Notice of Federal Tax Lien, I contacted Stefan Johansson. He explained that he was working with the IRS and had submitted an Offer in Compromise in September 2018 and would do an installment payment plan. At the time, Stefan Johansson was not an offeror and I had not solicited for the lease procurement.

8. On September 19, 2019, I distributed RLP 6FL0513 v.3 to all of the parties that expressed interest in the procurement, including: Stefan Johansson (for possible eligible properties at 612 SW Federal Highway, Stuart, FL and 2700 Kanner Highway, Stuart, FL); Bill Biggs (for a possible eligible property at 304 NW Flagler Avenue, Stuart, FL); and John and Robert Clark (for possible eligible properties at 1400 SW Chapman Way, Palm City, FL and 1100 SE Federal Highway, Stuart, FL). David Lewis of 1400 Chapman, LLC had not expressed interest in the procurement as of September 19, 2019

1

and was not distributed a copy on that day. The due date for offers was October 21, 2019 by 5pm.

9. I distributed RLP 6FL0513 v.3 with Amendment # 2 attached, which changed the ASR's, including the on-site requirement for the boat slip/dock, along with other changes. These changes were directly incorporated into RLP 6FL0513 v.3. *See AR Exhibit 2 and AR Exhibit 1, section 1.04(A) and Pages 1 and 14 of ASR.*

10. The boat slip/dock requirement was correctly stated in section 1.04(A) of RLP 6FL0513 v.3 as "1 on-site or within 5 miles..." It also correctly stated the boat slip/dock requirement on page 1 of the ASR as "1 boat slip/dock onsite or within 5 miles of the property offered." Page 14 of the ASR stated the boat slip/dock requirement as "1 onsite – boat slip / floating boat dock," which was an error; I had forgotten to revise that section of the ASR when I made the revisions to the requirement for the boat slip/dock. *See AR Exhibit 1, section 1.04(A) and Pages 1 and 14 of ASR.*

11. On October 17, 2019 I corrected this error through Amendment #3. The amended section read: "The boat slip/dock can be provided either onsite or within 5 miles of the property offered." *See AR Exhibit 3 at page 6.*

12. David Lewis of 1400 Chapman, LLC received a copy of Amendment #3 on October 25, 2019 when the RLP was distributed to him. David Lewis signed and returned a copy of Amendment #3. *See AR Exhibit 4 at page 7.*

13. On October 17, 2019, I distributed Amendment #3 via email to all the parties that had been distributed the RLP 6FL0513 v.3. David Lewis of 1400 Chapman, LLC had not been distributed a copy of Amendment #3 at that time because he had not yet expressed interest in the procurement and had not yet been distributed a copy of RLP 6FL0513 v.3.

14. On October 21, 2019, I received a timely initial offer for the property at 612 SW Federal Highway, Stuart, FL.

15. On or about October 24, 2019 David Lewis of 1400 Chapman, LLC, who was interested in offering the property at 1400 SW Chapman Way, Palm City FL, asked if I would still accept proposals for the subject procurement. I responded that he could still submit a proposal, but that it would be considered a late submission since initial offers were due on October 21, 2019 and we were past that date.

16. On October 24, 2019, I received an email from KC Mullen, wife of Tim Mullen, the Owner of 1400 SW Chapman Way, Palm City FL, transmitting a copy of an "Expression of Interest Proposal" (EOIP) dated October 21, 2019 from David Lewis. I checked my emails and could not locate an email dated October 21, 2019 from David Lewis.

17. Upon receipt of the October 24, 2019 email, I reviewed the EOIP and it did not contain a GSA Form 1364 (Proposal to Offer Space) or a GSA Form 1217 (Lessor's Annual Costs

2

Statement). As such, I considered the email as an Expression of Interest, not an Initial Proposal to offer space.

18. On October 25, 2019, I distributed by email to David Lewis RLP 6FL0513 v.3. Also included in the email was Amendment #3 and #4. In that email, I informed him that the term was for 15 years firm; initial offers were due October 21, 2019; proposal revisions had been requested and were due on October 31, 2019; and that offers could be submitted by email or hard copy to my office as listed in the email. I also informed him that any previous versions of the RLP issued for this procurement had been deleted in their entirety and replaced with RLP 6FL0513 v.3. *See AR Exhibit 5.*

19. On October 25, 2019, I notified Offerors through email regarding the RLP Requirement for Proof of Ownership and SAM. They were advised that the following three sources must match exactly in terms of the entity name to be deemed acceptable as proof of ownership for the subject procurement: DUNS number; SAM registration; and Purchase Option. I also advised that the Offerors would need to have an active SAM account available for all contracts with no exclusions in order for their proposal to be considered viable.

20. The RLP 6FL0513 v.3 required offerors to have an active SAM registration prior to Final Proposal Revisions (FPR), which was November 7, 2019. Windward Marina Stuart, LLC was registered on October 24, 2019 and had an active SAM registration as of November 7, 2019. *See AR Exhibit 1 at Section 3.05(H) and See Intervenor's Request for Dismissal at Exhibit B.* 1400 Chapman LLC did not have an active SAM registration until November 20, 2019. *See AR Exhibit 6.*

21. On October 29, 2019, I received an initial proposal from David Lewis of 1400 Chapman, LLC for the property at 1400 SW Chapman Way, Palm City FL.

22. As I reviewed the proposal submitted by David Lewis of 1400 Chapman, LLC, specifically the GSA Form 1364 (Proposal to Lease Space) and GSA Form 1217, (Lessor's Annual Costs Statement) I noticed miscalculations and/or errors and omissions.

23. For the GSA Form 1364, I noticed David Lewis of 1400 Chapman LLC did not calculate the total rate/sf correctly in row 18, columns d and e. For the Form 1217 I noticed amounts missing in Lines 10 and 18, and that amounts in lines 6, 7, 12 and 13 looked like monthly costs, not annual costs. I also noticed that Line 11 showed the Common Area Factor as 7%, but that it should have been 14%. *See Third Supplemental Protest at Exhibit 2, Forms 1364 and 1217.*

24. I brought these errors to the attention of David Lewis of 1400 Chapman LLC so he would have an opportunity to correct the miscalculations and/or errors and omissions, if he deemed appropriate, prior to the request for FPR's. At that time, he explained that he had not yet received his subcontractor pricing for the services identified in the GSA Form 1217.

25. At no time during the procurement did I infer or suggest to David Lewis of 1400 Chapman, LLC that it increase its price proposal.

26. On November 4, 2019, I requested FPR's from David Lewis of 1400 Chapman, LLC. This request reiterated the discussions I had with David Lewis regarding the Forms 1364 and 1217. *See AR Exhibit 7 at rows 1 and 2.*

27. On November 7, 2019, I received a FPR from David Lewis of 1400 Chapman, LLC for the property at 1400 SW Chapman Way. I also received a timely FPR from Daysi Johansson of Windward Marina Stuart, LLC for the property at 612 SW Federal Highway, Stuart, FL.

28. Both offerors met the requirement for a boat slip/dock onsite or within 5 miles.

29. The FPR submitted by David Lewis of 1400 Chapman, LLC did not include a Phase I Environmental Site Assessment (ESA) documenting the known environmental conditions on the property at 1400 SW Chapman Way, Palm City FL. Section 2.09 of the RLP 6FL0513 v.3 states "At the direction of the LCO, the Offeror must provide, at the Offeror's sole cost and expense, a current Phase I Environmental Site Assessment . . ." I knew that a Phase I ESA had existed on the property because of the previous lease, so I requested a copy of the Phase I ESA, which was provided. The Phase I ESA was completed in August 2018, one year before I solicited for this lease procurement. The 2018 Phase I ESA indicated that an outstanding, Recognized Environmental Conditions (REC) remained. No further documentation was submitted.

30. The FPR submitted by David Lewis of 1400 Chapman, LLC did not include ownership information for 1400 Chapman, LLC as I had requested in my FPR. *See Exhibit 7 at row 3.*

31. 1400 Chapman LLC offered a final price of $55.71/RSF and $63.78/ABOA SF; Windward Marina Stuart, LLC offered a final price of $49.99/RSF and $50.87/ABOA SF.

32. On January 10, 2020, I executed lease contract LFL00191v3 and I advised the successful offeror, Windward Marina Stuart LLC, it was selected for award.

33. On January 10, 2020, David Lewis of 1400 Chapman LLC was verbally advised by me and my supervisor, Keitra Harris that I selected another offeror for award under RLP 6FL0513 v3, Windward Marina Stuart LLC. They were advised they were not the lowest priced offeror in the procurement and a letter to formally notify them would be sent during the week of 1/13/20.

34. On January 11, 2020, 1400 Chapman LLC filed the subject protest with GAO.

35. On January 14, 2020, I delivered a copy of the signed lease contract LFL00191 v.3 to Windward Marina Stuart LLC.

4

John P Carrigan on behalf of Creditor Martin Downs Property Owners' Association, Inc.
jpc@reblawpa.com, mmj@reblawpa.com

Heidi A Feinman on behalf of U.S. Trustee Office of the US Trustee
Heidi.A.Feinman@usdoj.gov

Dana L Kaplan on behalf of Debtor Meridian Marina & Yacht Club of Palm City, LLC
dana@kelleylawoffice.com,
tina@kelleylawoffice.com;cassandra@kelleylawoffice.com;kristina@kelleylawoffice.com;debbie@kelleyl
awoffice.com;craig@kelleylawoffice.com

Craig I Kelley on behalf of Debtor Meridian Marina & Yacht Club of Palm City, LLC
craig@kelleylawoffice.com,
tina@kelleylawoffice.com;cassandra@kelleylawoffice.com;kristina@kelleylawoffice.com;debbie@kelleyl
awoffice.com;dana@kelleylawoffice.com

Susan D. Lasky, Esq on behalf of Creditor Martin County Marine Holdings LLC
ECF@suelasky.com, ecfsuelasky@gmail.com;r48532@notify.bestcase.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Alan B Rose, Esq on behalf of Creditor MRACHEK, FITZGERALD ROSE KONOPKA THOMAS & WEISS, P.A.
arose@mrachek-law.com, manderson@mrachek-law.com