# PURCHASE AND SALE AGREEMENT

**SELLER**:

MERIDIAN MARINA & YACHT CLUB OF PALM CITY, LLC

810 Saturn Street, #24
Jupiter, Florida  33477
Attn:  David Kendall
Email: _____

**PURCHASER**:

MARINA DEVELOPMENT PARTNERS, LLC

4767 New Broad Street
Orlando, Florida  32814
Attn:  Matthew Juall
Email: mjuall@marinadp.com

**PROPERTY**:

Meridian Marina
Martin County, Florida

**DATED AS OF**:

April ____,  2020

#74208531_v2

Summary Sheet

Purchaser:              Marina Development Partners, LLC

Seller:                 Meridian Marina & Yacht Club of Palm City, LLC

Title Agent:            Holland & Knight LLP, as title agent for First American Title Insurance
                        Company

Property:               Meridian Marina, Martin County, Florida

Purchase Price:         $6,500,000

Initial Deposit:        $10,000

Additional Deposit:     $100,000

Date of Closing:        [August _____],2020

#74208531_v2

INDEX

[To Be Finalized Prior to PSA Execution]

Section 1          The Property
        1.1        Description
        1.2        As-Is Purchase
        1.3        Agreement to Convey

Section 2          Price and Payment
        2.1        Purchase Price
        2.2        Payment and Closing

Section 3          Inspections
        3.1        Inspections
        3.2        Title and Survey
        3.3        Contracts
        3.4        Permitted Encumbrances
        3.5        Confidentiality
        3.6         Prior to Closing
        3.7        Damage, Destruction or Condemnation

Section 4          Representations and Warranties
        4.1        By Seller
        4.2        By Purchaser
        4.3        Mutual
        4.4        Knowledge; Received Written Notice

Section 5          Costs and Prorations
        5.1        Purchaser's Costs
        5.2        Seller's Costs
        5.3        Prorations
        5.4        In General
        5.5        Purpose and Intent

Section 6          Notices

Section 7          Closing and Escrow
        7.1        Escrow Instructions
        7.2        Seller's Deliveries
        7.3        Purchaser's Deliveries
        7.4        Insurance
        7.5        Utility Service and Deposits
        7.6        Notice Letters

3

Section 8        Default; Failure of Condition
        8.1        Purchaser Default
        8.2        Seller Default

Section 9        Miscellaneous
        9.1        Entire Agreement
        9.2        Severability
        9.3        Applicable Law
        9.4        Assignability
        9.5        Successors Bound
        9.6        No Public Disclosure
        9.7        Captions
        9.8        Attorneys' Fees
        9.9        No Partnership
        9.10       Time of Essence
        9.11       Counterparts
        9.12       Recordation
        9.13       Proper Execution
        9.14       Merger
        9.15       Limited Recourse
        9.16       Survival of Representations and Warranties
        9.17       Like-Kind Exchange
        9.18       Calculation of Time Periods
        9.17       Force Majeure

Section 10       Purchase Option
        10.1       Exercise of Option; Assignability
        10.2       Purchase Price
        10.3       Purchase Agreement
        10.4       Zoning/Land Use Approvals
        10.5       Use of Option Property
        10.6       Memorandum of Option

<u>List of Exhibits</u>

Exhibit 1.1.1        Legal Description of Land
Exhibit 1.1.3        Inventory of Personal Property
Exhibit 1.1.6        Schedule of Leases
Exhibit 3.1          Books and Records
Exhibit 3.3          Schedule of Contracts
Exhibit 7.2.2        Form of Bill of Sale
Exhibit 7.2.3        Form of Assignment and Assumption of Leases
Exhibit 7.2.4        Form of Assignment and Assumption of Contracts

#74208531_v2

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of the ____ day of April, 2020 (the "Effective Date"), is made by and between **MERIDIAN MARINA & YACHT CLUB OF PALM CITY, LLC**, a Florida limited liability company ("Seller"), with an address at 810 Saturn Street, #24, Jupiter, Florida  33477, Attn:  David Kendall, Email: _____, and **MARINA DEVELOPMENT PARTNERS, LLC**, a Florida limited liability company ("Purchaser"), with an address at 4767 New Broad Street, Orlando, Florida  32814, Attn:  Matthew Juall, Email: mjuall@marinadp.com.

RECITALS:

Seller owns certain real and personal property located at and used in connection with that certain marina generally known as "Meridian Marina" located along the shores of the St. Lucie River in Martin County, Florida, as more particularly described hereinbelow.  Subject to the terms, provisions and conditions set forth herein, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Property (as hereinafter defined).

NOW, THEREFORE, in consideration of the foregoing, of the covenants, promises and undertakings set forth herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller and Purchaser agree as follows:

1.      The Property.

1.1      Description:  Subject to the terms and conditions of this Agreement, and for the consideration herein set forth, Seller agrees to sell and transfer, and Purchaser agrees to purchase and acquire, all of Seller's right, title, and interest in and to the following (collectively, the "Property"):

1.1.1    That certain land located in Martin County, Florida commonly known as "Meridian Marina" and more specifically described in Exhibit 1.1.1 attached hereto (the "Land") and comprising approximately 6.5 acres;

1.1.2    The buildings, parking areas, improvements, and fixtures now situated on the Land (the "Improvements");

1.1.3    All docks, piers, landings, wet slips, dry slips, boat lifts, barges, boats, furniture, personal property (including food, beverage, fuel and other inventory and supplies), machinery, apparatus, and equipment owned by Seller and currently used in the operation, repair or maintenance of the Land and the Improvements and situated thereon (collectively, the "Personal Property"), including the personal property described on Exhibit 1.1.3. The Personal Property to be conveyed is subject to depletions, replacements and additions in the ordinary course of Seller's businesses;

1.1.4    All easements, rights, interests, hereditaments, and appurtenances belonging to or inuring to the benefit of Seller and pertaining to the Land, if any;

1.1.5    Any street or road abutting the Land to the center lines thereof;

1.1.6    The leases, licenses or occupancy agreements, as amended from time to time, including those in effect on the date of this Agreement which are identified on Exhibit 1.1.6, and any new leases, licenses or occupancy agreements entered into which as of the Closing (as hereinafter defined) affect all or any portion of the Land or the Improvements (the "Leases"), and any security deposits actually held by Seller with respect to any such Leases;

1.1.7    The contracts and agreements relating to the operation, improvement or maintenance of the Land, the Improvements or the Personal Property and described in <u>Exhibit 3.3</u> attached hereto (the "<u>Contracts</u>"), subject to the provisions of Section 3.3;

1.1.8    Assignable warranties, indemnitees, claims and guaranties issued, or against others, in connection with the Improvements or the Personal Property;

1.1.9    All transferable consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality (each a "<u>Governmental Authority</u>") in respect of the Land or the Improvements (collectively, the "<u>Permits</u>");

1.1.10    All accounts receivable for rent and other amounts due under Leases;

1.1.11    All books and records of Seller which are used by Seller in connection with the ownership and operation of the Property; and

1.1.12    That certain Sovereignty Submerged Lands Lease No. _____ (the "<u>Submerged Lands Lease</u>").

1.2    <u>"As-Is" Purchase</u>

1.2.1    No representation, warranty, agreement, statement, guarantee or promise, if any, made by any person acting on behalf of Seller which is not contained in this Agreement will be valid or binding on Seller.

1.2.2    PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (I) VALUE; (II) THE INCOME TO BE DERIVED FROM THE PROPERTY; (III) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY CONDUCT THEREON, INCLUDING, WITHOUT LIMITATION, THE POSSIBILITIES, IF ANY, FOR FUTURE DEVELOPMENT OF THE PROPERTY; (IV) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; **[\*\*\*(V) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY; (VI) THE NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE INDOOR AND OUTDOOR ENVIRONMENT AIR QUALITY, WATER, SOIL AND GEOLOGY; (VII) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (VIII) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY; (IX) COMPLIANCE WITH ANY FEDERAL, STATE, AND LOCAL ENVIRONMENTAL PROTECTION, POLLUTION, HEALTH AND SAFETY OR LAND USE LAWS, RULES, REGULATIONS, ORDINANCES, ORDERS, REQUIREMENTS OR COMMON LAW, INCLUDING, WITHOUT LIMITATION, TITLE III OF THE AMERICANS WITH DISABILITIES ACT OF 1990, AS AMENDED, THE FEDERAL WATER POLLUTION CONTROL ACT, AS AMENDED, THE RESOURCE CONSERVATION AND RECOVERY ACT, AS AMENDED, THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION**

6

**AND LIABILITY ACT OF 1980, AS AMENDED, THE SAFE DRINKING WATER ACT, AS AMENDED, THE HAZARDOUS MATERIALS TRANSPORTATION ACT, AS AMENDED, THE OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970, AS AMENDED, THE TOXIC SUBSTANCE CONTROL ACT, AS AMENDED, AND REGULATIONS PROMULGATED UNDER ANY OF THE FOREGOING AND ANALOGOUS STATE STATUTES AND REGULATIONS; (X) THE PRESENCE OR ABSENCE OF HAZARDOUS OR TOXIC MATERIALS, SUBSTANCES OR WASTE AT, ON, UNDER, OR ADJACENT TO THE PROPERTY; (XI) THE CONTENT, COMPLETENESS OR ACCURACY OF THE DUE DILIGENCE MATERIALS OR PRELIMINARY REPORT REGARDING TITLE; (XII) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY INCLUDING ANY PLANS AND SPECIFICATIONS THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PURCHASER; (XIII) THE CONFORMITY OF THE PROPERTY TO PAST, CURRENT OR FUTURE APPLICABLE ZONING OR BUILDING REQUIREMENTS; (XIV) DEFICIENCY OF ANY UNDERSHORING, (XV) DEFICIENCY OF ANY DRAINAGE; (XVI) THE FACT THAT ALL OR A PORTION OF THE PROPERTY MAY BE LOCATED ON OR NEAR AN EARTHQUAKE FAULT LINE; (XVII) THE EXISTENCE OF VESTED LAND USE, ZONING OR BUILDING ENTITLEMENTS AFFECTING THE PROPERTY; OR (XVIII) WITH RESPECT TO ANY OTHER MATTER. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY AND REVIEW INFORMATION AND DOCUMENTATION AFFECTING THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND REVIEW OF SUCH INFORMATION AND DOCUMENTATION, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER.\*\*\*]** PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION MADE AVAILABLE TO PURCHASER OR PROVIDED OR TO BE PROVIDED BY OR ON BEHALF OF SELLER WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT. PURCHASER AGREES TO FULLY AND IRREVOCABLY RELEASE SELLER FROM ANY AND ALL CLAIMS THAT PURCHASER MAY NOW HAVE OR HEREAFTER ACQUIRE AGAINST SELLER FOR ANY COSTS, LOSS, LIABILITY, DAMAGE, EXPENSE, DEMAND, ACTION OR CAUSE OF ACTION ARISING FROM SUCH INFORMATION OR DOCUMENTATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY ORAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS, AND THAT SELLER HAS NO OBLIGATION TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS EXCEPT AS MAY OTHERWISE BE EXPRESSLY STATED HEREIN. PURCHASER REPRESENTS, WARRANTS, AND COVENANTS TO SELLER, WHICH REPRESENTATION, WARRANTY, AND COVENANTS TO SELLER SHALL SURVIVE THE CLOSING AND NOT BE MERGED WITH THE DEED (AS HEREINAFTER DEFINED), THAT, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SPECIFIED IN THIS AGREEMENT, PURCHASER IS RELYING SOLELY UPON PURCHASER'S OWN INVESTIGATION OF THE PROPERTY.

   1.2.3 Nothing contained in this Agreement shall be construed as authorizing Purchaser to apply for a zoning change, variance, subdivision map, lot line adjustment or other discretionary governmental act, approval or permit with respect to the Property prior to the Closing, and Purchaser agrees

7

not to do so without Seller's prior written approval, which approval may be withheld in Seller's sole and absolute discretion. Purchaser agrees not to submit any reports, studies or other documents, including, without limitation, plans and specifications, impact statements for water, sewage, drainage or traffic, environmental review forms, or energy conservation checklists to any governmental agency, or any amendment or modification to any such instruments or documents prior to the Closing unless first approved by Seller, which approval Seller may not unreasonably withhold. Purchaser's obligation to purchase the Property shall not be subject to or conditioned upon Purchaser's obtaining any variances, zoning amendments, subdivision maps, lot line adjustment, or other discretionary governmental act, approval or permit.

        1.2.4    Except with respect to any express representations and warranties of Seller contained herein, Purchaser and anyone claiming by, through or under Purchaser hereby waives its right to recover from and fully and irrevocably releases Seller, its employees, officers, directors, representatives, agents, managers, members, consultants, advisers, servants, attorneys, affiliates, parent, subsidiaries, successors and assigns, and all persons, firms, corporations, entities and organizations in its behalf ("Released Parties") from any and all claims that it may now have or hereafter acquire against any of the Released Parties for any costs, loss, liability, damage, expenses, demand, action or cause of action arising from or related to any construction defects, errors, omissions or other physical conditions, latent or otherwise, including environmental matters, affecting the Property, or any portion thereof. The foregoing release includes claims of which Purchaser is presently unaware or which Purchaser does not presently suspect to exist which, if known by Purchaser, would materially affect Purchaser's release to the Released Parties.

        1.3    Agreement to Convey.  Seller agrees to convey, and Purchaser agrees to accept, title to the Land and the Improvements by special warranty deed in form and substance reasonably acceptable to Seller and Purchaser (the "Deed"), subject only to the matters deemed to be Permitted Encumbrances (as such term is hereinafter defined), and title to the Personal Property by bill of sale in the form attached hereto as Exhibit 7.2.2, without warranty as to the title to or the condition of such personalty.

2.    Price and Payment.

        2.1    Purchase Price.  The purchase price for the Property ("Purchase Price") is Six Million Five Hundred Thousand and 00/100 Dollars ($6,500,000.00).

        2.2    Payment and Closing.  Payment of the Purchase Price is to be made in cash as follows:

        2.2.1    (a) Purchaser has made an earnest money deposit of Ten Thousand and 00/100 Dollars ($10,000.00) (the "Initial Deposit") to the Title Agent (as defined below) prior to the Effective Date. Within fourteen (14) business days after the Effective Date, Purchaser shall deposit with the Title Agent an additional deposit of One Hundred Thousand and No/100 Dollars ($100,000.00) (the "Additional Deposit"). The Initial Deposit and the Additional Deposit shall be referred to herein, collectively or individually, as the context may require, as the "Deposit". The failure of Purchaser to timely deliver the Deposit to the Title Agent as set forth herein shall be a material default hereunder, and upon notice from Seller to Purchaser prior to the delivery of the Deposit (or the applicable portion thereof), this Agreement shall terminate and neither party hereunder shall have any further rights hereunder. The Deposit shall be non-refundable to Purchaser and immediately deemed earned by Seller for all purposes hereunder, subject only to the applicable provisions of Sections 3.1, 3.2, 3.7.1, 4.1 and 8.2 hereof.

        (b) The Deposit, when paid, will be placed and held in escrow by Holland & Knight LLP (the "Title Agent"), pursuant to a separate Escrow Agreement executed between Seller, Purchaser and Title Agent (the "Escrow Agreement").

(c)  Any interest earned by the Deposit shall be considered as part of the Deposit.  Except as otherwise provided in this Agreement, the Deposit will be applied to the Purchase Price at the Closing.

2.2.2    At the Closing, Purchaser shall pay the Purchase Price, exclusive of the Deposit and subject to adjustment for the prorations as provided herein, to a bank account designated by Seller via wire transfer in immediately available funds.  Payment of the Purchase Price and the closing hereunder (the "Closing") will take place pursuant to an escrow closing on the date, subject to any extension contemplated herein, which is sixty (60) days following the expiration of the Due Diligence Period ("Date of Closing"), through the offices of the Title Agent (and the net proceeds due Seller shall be wired to Seller not later than 5:00 P.M. eastern time on the Date of Closing) or at such other time and place as may be agreed upon in writing by Seller and Purchaser.

3.    Inspections.

3.1    Inspections.  Within seven (7) days after the Effective Date, to the extent within Seller's immediate possession or control, Seller shall provide to Purchaser the documents set forth in Exhibit 3.1 attached hereto and incorporated herein by this reference. Except as may be expressly set forth in this Agreement, Seller makes no representations or warranties as to the truth, accuracy or completeness of any materials, data or other information supplied to Purchaser in connection with Purchaser's inspection of the Property (e.g., that such materials are complete, accurate or the final version thereof, or that all such materials are in Seller's possession).  **[\*\*\*Except as otherwise expressly provided in this Agreement, it is the parties' express understanding and agreement that such materials are provided only for Purchaser's convenience in making its own examination and determination as to whether it wishes to purchase the Property, and, in doing so, Purchaser shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller.\*\*\*]**  Purchaser and its invitees and agents shall have the right, during the period (the "Due Diligence Period") beginning on the Effective Date and ending on the date which is sixty (60) days thereafter, to enter upon the Property to conduct all inspections and investigations of the condition and all other aspects of the Property which it may reasonably deem necessary or desirable (collectively, "Inspections"), including, but not limited to, the performance of surveys, tests, studies, inquiries, investigation and reviews relating to the Property, and the right to review and copy all Leases, Contracts, warranties and other information in Seller's immediate possession or control regarding the Property (provided, however, Purchaser shall provide Seller with at least twenty-four (24) hours prior written notice of any entry on the Property by Purchaser or its agents, employees, or contractors in connection with any Inspections).  **[\*\*\*Furthermore, prior to any entry on the Property, Purchaser shall obtain and deliver to Seller proof that Purchaser has obtained and fully paid for a commercial general liability policy providing coverage of at least $1,000,000.00 per occurrence, naming Seller and its property manager as additional insureds and covering all activities of Purchaser and Purchaser's contractors, agents and representatives on or about the Property (including Purchaser's indemnity obligations hereunder, which shall be in form and substance satisfactory to Seller).\*\*\*]**    Purchaser shall protect, defend, indemnify and hold Seller and their respective affiliates and subsidiaries, and their respective direct and indirect members, partners, directors, officers, participants, employees, consultants, advisers, managers and agents free and harmless from and against any and all claims (including third party claims), demands, liabilities, damages, costs and expenses, including, without limitation, investigatory expenses, clean-up costs and reasonable attorneys' fees of whatever kind or nature arising from or in any way connected with the Inspections, to the extent caused by Purchaser or its contractors, agents or representatives.  Purchaser's obligations of indemnity set forth herein shall survive the Closing and shall not be merged with the Deed. If Purchaser, in its sole and absolute discretion, desires not to purchase the Property for any reason or no reason, then Purchaser may terminate this Agreement by providing written notice thereof to Seller at any time on or prior to the date of expiration of the Due Diligence Period, whereupon the Deposit (including any interest earned thereon) shall

9

be returned to Purchaser, this Agreement shall terminate and neither party hereto shall have any liability to the other except for Purchaser's obligations which expressly survive the termination of this Agreement. In the event of such termination by Purchaser, Purchaser shall forward to Seller copies of all reports, assessments and surveys prepared in connection with Purchaser's Inspections hereunder.

      3.2    Title and Survey. Purchaser shall cause the Title Agent to issue a commitment for a policy of title insurance relative to the Property (the "Title Commitment"). Purchaser shall also be responsible for obtaining a survey of the Property ("Survey"). On or prior to the date which is ten (10) days prior to the expiration of the Due Diligence Period, Purchaser shall notify Seller, in writing, of such objections as Purchaser may have to anything contained in the Title Commitment and the Survey. All matters of record, as well as all matters which would be shown by a current, accurate ALTA survey of the Property to which, in either case, Purchaser does not object during the Due Diligence Period will be deemed a "Permitted Encumbrance" hereunder; provided, however, Purchaser shall be permitted to raise as title objections (within five (5) business days of Purchaser being notified thereof) new matters affecting title of which Purchaser receives notice by an amendment or update of the Title Commitment. In the event Purchaser notifies Seller of objections to title or survey matters prior to the applicable deadline date as aforesaid, Seller will have the right, but not the obligation, to cure such objections (except that Seller shall be obligated to cure all Monetary Liens (as defined herein)). Within five (5) days after receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing if Seller elects to cure such objections or if Seller elects not to cure such objections ("Seller's Cure Notice"). If Seller provides no notice, then Seller shall be deemed to have elected not to cure. If Seller elects to cure such objections, Seller will have until the date of Closing to remove, satisfy or cure the same (including, without limitation, by bonding over the applicable exception). If Seller elects not to cure such objections, Purchaser shall have the following options: (i) to accept a conveyance of the Property subject to those certain matters objected to by Purchaser which Seller is unwilling to cure, and without reduction of the Purchase Price; or (ii) to terminate this Agreement by sending written notice thereof to Seller within five (5) days after receipt of Seller's Cure Notice (or if, applicable, within five (5) days after the date Seller is deemed to have elected not to cure the applicable objections). Upon delivery of such notice of termination, this Agreement will terminate and the Deposit (including any interest earned thereon) shall be returned to Purchaser, and thereafter neither party hereto will have any further rights, obligations or liabilities hereunder except this Agreement shall terminate and neither party hereto shall have any liability to the other, except for obligations which expressly survive the termination of this Agreement. Seller shall be obligated to pay off at Closing any mortgages and other liens securing the payment of money created or suffered to be created by, or arising out of the acts of, Seller and which may be cured or removed by the payment of money ("Monetary Liens").

      3.3    Contracts. On or prior to the date which is fifteen (15) days prior to the expiration of the Due Diligence Period, Purchaser shall notify Seller as to which Contracts, if any, Purchaser will assume and which Contracts shall be terminated by Seller at Closing (those contracts to be assumed by Purchaser at Closing as herein provided, collectively, the "Assumed Contracts"). Notwithstanding the foregoing or any other provision herein to the contrary, the Assumed Contracts shall include the Contracts listed on Exhibit 3.3 as being Contracts that are not terminable at Closing. Purchaser will assume the obligations first accruing and arising from and after the Date of Closing under the Assumed Contracts, Seller shall remain responsible for the obligations under the Contracts arising prior to the Date of Closing and Seller shall terminate all other Contracts at or prior to Closing. **[\*\*\*Seller shall terminate at Closing, and Purchaser shall not assume, any property management agreement affecting the Property.\*\*\*]**

      3.4    Permitted Encumbrances. Purchaser shall be deemed to have approved the state of title to the Property and to have agreed to purchase the Property subject to the following:

            3.4.1    All matters deemed to be Permitted Encumbrances pursuant to Section 3.2 hereof;

3.4.2    the Assumed Contracts and the Leases (and the rights of the tenants thereunder) and all contracts and leases (and the rights of the tenants thereunder) described in Section 3.6.3 and Section 3.6.4;

3.4.3    the lien of non-delinquent real and personal property taxes and assessments, subject to the proration provisions hereof;

3.4.4    any service, installation, connection, maintenance or construction charges due after the Closing, and subject to the proration provisions hereof, for sewer, water, electricity, telephone, cable television or gas;

3.4.5    governmental laws, codes, ordinances, and restrictions now or hereafter in effect in so far as these affect the Property, which includes without limitation, applicable zoning, subdivision, building and other land use laws and regulations; and

3.4.6    all matters, whether or not of record, that arise out of the actions of Purchaser or its agents, representatives or contractors.

All of the foregoing are referred to herein collectively as "Permitted Encumbrances".

3.5    Confidentiality.  Unless Seller specifically and expressly otherwise agrees in writing, Purchaser agrees that all information regarding the Property of whatsoever nature made available to it by Seller or Seller's agents or representatives ("Proprietary Information") is confidential and shall not be disclosed to any other person except those assisting Purchaser with the transaction, or Purchaser's lender, if any.  In the event the purchase and sale contemplated hereby fails to close for any reason whatsoever, Purchaser agrees to return to Seller, or cause to be returned to Seller, all Proprietary Information. Notwithstanding any other term of this Agreement, the provisions of this Section 3.5 shall survive the Closing or the termination of this Agreement.

3.6    Prior to Closing.  Until the Closing, notwithstanding anything in this Agreement to the contrary, Seller or Seller's agents:

3.6.1    Shall keep the Property insured against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

3.6.2    Shall operate and maintain the Property in a businesslike manner and substantially in accordance with Seller's past practices with respect to the Property, and make any and all repairs and replacements reasonably required to deliver the Property to Purchaser at the Closing in its present condition, normal wear and tear excepted (not to include any repairs and replacements which are the responsibility of tenants under the Leases), provided that in the event of any loss or damage to the Property as described in Section 3.7, Seller shall have an obligation to Purchaser to repair the Property only if Seller so elects and then shall be obligated only to the extent of available insurance proceeds.

3.6.3    Shall enter into only those third-party contracts which are necessary to carry out its obligations under Section 3.6.2 and which shall be cancelable on thirty (30) days written notice without penalty.  If Seller enters into any such contract, it shall promptly provide written notice thereof to Purchaser and unless Purchaser, within seven (7) days thereafter, notifies the respective Seller in writing of its intention to assume such contract, it shall not be treated as a contract assumed by Purchaser under Section 3.3 hereof.

11

      3.6.4    From and after the Effective Date, Seller shall not enter into any Leases or amendments or terminations to Leases without the consent of Purchaser other than such Leases or amendments or terminations to Leases that (i) are entered into in the ordinary course of business, and (ii) if applicable, preclude the landlord from receiving or accepting any payments due under such applicable Lease more than twelve (12) months in advance.  Seller shall provide a copy of any such Lease or amendment or termination to Lease at Closing.

      3.7    <u>Damage, Destruction or Condemnation</u>.

      3.7.1    If, prior to the Closing, the building(s), docks or other Improvements on the Property are damaged by a casualty event to the extent that the cost to restore such damage would be in excess of ten percent (10%) of the Purchase Price, or if such building(s), docks or improvements or any part hereof are taken under power of eminent domain, or if any access to the Land is taken under power of eminent domain, or if any tenant, licensee or other occupant under a Lease (an "<u>Occupant</u>") can terminate its Lease due to such taking and has not waived such termination right, Purchaser may elect to terminate this Agreement by giving written notice of its election to Seller within fourteen (14) days after receiving notice of such destruction or taking.  If Purchaser does not give such written notice within such fourteen (14) day period, this transaction shall be consummated on the date and at the Purchase Price provided for in Section 2, and Seller will assign to Purchaser the physical damage proceeds of any insurance policy(ies) payable to Seller, or Seller's portion of any condemnation award; and, if an insured casualty, pay to Purchaser the amount of any deductible but not to exceed the amount of the loss.

      3.7.2    If, prior to the Closing, a casualty event or taking occurs but such casualty or taking event does not give rise to a termination right in favor of Purchaser as described in Section 3.7.1 above, Purchaser shall close this transaction on the date and at the Purchase Price agreed upon in Section 2, and Seller will assign to Purchaser the physical damage proceeds of any insurance policies payable to Seller, or Seller's portion of any condemnation award, in both cases, up to the amount of the Purchase Price (less any amounts actually expended by Seller prior to Closing in restoring the Property); and, if an insured casualty, pay to Purchaser the amount of any deductible but not to exceed the amount of the loss.

4.    <u>Representations and Warranties</u>.

      4.1    <u>By the Seller</u>.  Seller represents and warrants to Purchaser that:

      4.1.1    "Seller" is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida and is authorized to transact business in the State of Florida. Seller has full power and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.  This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be, duly authorized, executed and delivered by Seller and valid and legally binding upon Seller and enforceable in accordance with their respective terms.

      4.1.2    Seller has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Seller of its obligations hereunder. The execution, delivery and performance of this Agreement by Seller does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the operating agreement or other organizational document of Seller or, to Seller's knowledge, any provision of any agreement, instrument, order, judgment or decree to which Seller is a party or by which Seller or any of its assets are bound.

#74208531_v2

4.1.3    Neither Seller nor any of its affiliates, nor any of their owners, employees, officers, managers, partners or directors, is a person or entity described by Section 1 of the Executive Order (No. 13224) Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (September 24, 2001), or whose name appears on the United States Treasury Department's Office of Foreign Assets Control most current list of "Specifically Designated National and Blocked Persons", and engages in any dealings or transactions, and is otherwise associated, with any such persons or entities.

4.1.4    Except to the extent disclosed to Purchaser in writing or in the materials made available to Purchaser for its review prior to the date hereof, Seller has not received written notice of any proposed special assessments which would affect the Land or the Improvements.

4.1.5    Seller has not received written notice from any Governmental Authority having jurisdiction over the Property stating that the Property is in violation of, any Permit, zoning, building, fire or health code or other applicable law which remains uncured.

4.1.6    Seller has not received written notice from any Governmental Authority having jurisdiction over the Property stating that the Property is in violation of any Environmental Law which remains uncured.  As used herein, "Environmental Law" means, collectively, (1) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA") (41 U.S.C. § 9601 et seq.) the Resource Conservation and Recovery Act, 42 U.S.C. § § 6901 et seq. ("RCRA"), and the Toxic Substances Control Act, as amended ("TSCA") (15 U.S.C. § 2601 et seq.); and (2) any other federal, state or local laws, ordinances, statutes, codes, rules, regulations, orders or decrees now or hereinafter in effect relating to (A) pollution, (B) the protection or regulation of human health, natural resources or the environment, (C) the treatment, storage or disposal of Hazardous Materials, or (D) the emission, discharge, release or threatened release of Hazardous Materials into the environment.  As used herein, "Hazardous Materials" means, collectively, any chemical, waste, or other material that is or contains (1) any "hazardous substance" as now or hereafter defined in § 101(14) of CERCLA or any regulations promulgated under CERCLA; (2) any "hazardous" or "toxic" waste as now or hereafter defined in RCRA or any regulations promulgated under RCRA; (3) any substance now or hereafter regulated by TSCA or any regulations, rule, order or requirement promulgated under TSCA; (4) petroleum, petroleum by products, gasoline, diesel fuel, or other petroleum hydrocarbons; (5) asbestos and asbestos-containing material in any form, whether friable or non-friable; (6) polychlorinated byphenyls; or (7) lead and lead-containing products.  Except for the ____ (___) above-ground storage tanks which serve as the fuel system for the Property, there are no storage tanks located on the Property.

4.1.7    There are no condemnation, zoning or other land-use regulation proceedings, either instituted, or planned to be instituted, with respect to the Property which would adversely affect the use and operation of the Property for its intended purpose or the value of the Property, nor has Seller received notice of any special assessment proceedings affecting the Property.

4.1.8    Seller is not a party in any legal proceedings relating to Seller or the Property (and has not received any written notice of any threatened legal proceeding relating to Seller or the Property) which, if adversely determined, would have a material adverse effect on the Property or would prevent Seller from consummating the transaction contemplated.

4.1.9    The Leases identified on Exhibit 1.1.6 are the only leases, licenses or occupancy agreements currently in effect with respect to the Property and Seller has provided a true and complete copy of each Lease to Purchaser.  Seller has not received written notice from any Occupant of a default under its Lease, which default remains uncured.

4.1.10   To the best of Seller's knowledge, all of the Proprietary Information is true correct and complete in all material respects.

4.1.11   No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under federal or state bankruptcy law is pending against Seller.

4.1.12   Seller has provided Purchaser a true and complete copy of each of the Contracts (to the extent in Seller's possession), and the list of Contracts on <u>Exhibit 3.3</u> is true and complete.  Seller has not sent a default notice to any such contract party which remains uncured. Seller has not received written notice from any such contract party of a default by Seller under any Contract which default by Seller remains uncured.

4.1.13   Seller is not a "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>").

The foregoing representations and warranties shall be deemed to have been reaffirmed and restated in all material respects by Seller as of the Date of Closing, as described in Section 7.2.8 below.  Seller shall give Purchaser prompt written notice of any material change in any of the foregoing representations or warranties or any material breach thereof that occurs prior to the Closing (each a "<u>Disclosure</u>" and collectively, the "<u>Disclosures</u>"), which Disclosures shall thereafter be updated by Seller prior to the Date of Closing (and the affected representations and warranties shall at Closing be deemed updated by such Disclosures, subject to Purchaser's termination right described below). If any change in any of the foregoing representations or any breach of any of the foregoing warranties or agreements is a material change or breach, and Seller does not elect to cure such matters within ten (10) business days after Seller's receipt of a written request from Purchaser to do so (which ten (10) business day period shall, to the extent applicable, extend the Date of Closing), then Seller shall provide written notice to Purchaser of its election not to cure such matters.  Notwithstanding anything contained herein to the contrary, if Seller elects not to cure such matters, Purchaser, at its sole option, and as its sole remedy, may either (a) close and consummate the transaction contemplated by this Agreement on the Date of Closing, without reduction in the Purchase Price, or (b) terminate this Agreement by written notice to Seller, whereupon the Title Agent shall return the Deposit to Purchaser and the parties shall have no rights or obligations hereunder, except for those that expressly survive any such termination. Such election shall be made by Purchaser within five (5) business days after receipt of written notice from Seller that Seller has elected not to cure such material change or breach.  Failure of Purchaser to deliver to Seller a notice of such election of Purchaser within such five (5) business day period shall conclusively be construed as Purchaser's having elected alternative (a) above.  The Date of Closing shall be postponed automatically, if necessary, to permit the full running of such period.  Notwithstanding the foregoing, in the event Seller willfully caused the material change or breach, Seller shall be in default hereunder and Purchaser shall have the rights and remedies set forth in Section 8.2 hereof.  As used in this Section 4, a breach or change in a representation or warranty of Seller hereunder shall be "material" if the same has, or will have, a material adverse effect on the value, financial condition, physical condition or operation of the Property or is a breach of Section 4.1.1, 4.1.2 or 4.1.6.

4.2   <u>By Purchaser</u>.  Purchaser represents and warrants to Seller that:

4.2.1   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida.  Purchaser has full power and authority to enter into and perform all of the obligations required of Purchaser under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.  This Agreement is, and all agreements, instruments and documents to be executed and delivered by Purchaser pursuant to this Agreement shall be, duly authorized, executed and delivered by Purchaser and valid and legally binding upon Purchaser and enforceable in accordance with their respective terms.

#74208531_v2

4.2.2    Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder. The execution, delivery and performance of this Agreement by Purchaser does not, and the consummation of the transactions contemplated hereby will not, violate any provision of the operating agreement or other organizational document of Purchaser or, to Purchaser's knowledge, any provision of any agreement, instrument, order, judgment or decree to which Purchaser is a party or by which Purchaser or any of its assets are bound.

4.2.3    Neither Purchaser nor any of its affiliates, nor any of their owners, employees, officers, managers, partners or directors, is a person or entity described by Section 1 of the Executive Order (No. 13224) Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (September 24, 2001), or whose name appears on the United States Treasury Department's Office of Foreign Assets Control most current list of "Specifically Designated National and Blocked Persons", and engages in any dealings or transactions, and is otherwise associated, with any such persons or entities.

4.2.4    No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or State bankruptcy laws is pending against or contemplated by Purchaser.

4.2.5    Purchaser shall not use the assets of an employee benefit plan as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and covered under Title I, Part 4 of ERISA or Section 4975 of the Code of 1986 in the performance or discharge of its obligations hereunder, including the acquisition of the Property.  Purchaser shall not assign its interest hereunder to any person or entity which does not expressly make this covenant and warranty for the benefit of Seller.

4.3    Mutual.  Each of Seller and Purchaser represents to the other that it has had no dealings, negotiations, or consultations with any broker, representative, employee, agent or other intermediary in connection with this Agreement or the sale of the Property other than [SVN] and the Seller and Purchaser shall each be responsible for paying a commission equal to one percent (1%) of the Purchase Price.  Seller and Purchaser agree that each will indemnify, defend and hold the other free and harmless from the claims of any other broker(s), representative(s), employee(s), agent(s) or other intermediary(ies) claiming to have represented Seller or Purchaser, respectively, or otherwise to be entitled to compensation in connection with this Agreement or in connection with the sale of the Property.

4.4    Knowledge; Received Written Notice.  Whenever a representation or warranty is made in this Agreement on the basis of Seller's knowledge, or whether Seller has received written notice, such representation, warranty or other statement is made with the exclusion of any facts disclosed to or otherwise known by Purchaser or its agents, and is made solely on the basis of the current, conscious, and actual, as distinguished from implied, imputed and constructive, knowledge on the date that such representation or warranty is made, without inquiry or investigation or duty thereof, of [_____ and _____], without attribution to such specific officers of facts and matters otherwise within the personal knowledge of any other representatives or employees of Seller or third parties, including but not limited to tenants and property managers of the Property, and excluding, whether or not actually known by such specific officer, any matter known to Purchaser or its agents at the time of Closing.

#74208531_v2

5.      <u>Costs and Prorations.</u>

      5.1      <u>Purchaser's Costs.</u>  Purchaser will pay (or reimburse Seller for) the following costs of closing this transaction:

            5.1.1      The fees and disbursements of Purchaser's counsel, inspecting architect and engineer, if any, and all other costs of or related to Purchaser's Inspections;

            5.1.2      One-half (½) of any escrow and closing fees to the Title Agent;

            5.1.3      The cost of any title search and the costs of the owner's title policy (including, without limitation, the premium therefor), any mortgagee policy and any title endorsements thereto;

            5.1.4      The cost of the Survey, and the costs of any other survey or any environmental study of the Property obtained by Purchaser;

            5.1.5      All expenses pertaining to any financing obtained by Purchaser;

            5.1.6      One-half (½) of all recording fees payable in connection with the recording of the Deed or other documents recorded in connection with the transaction;

            5.1.7      One-half (½) of any real estate transfer, stamp, recordation or documentary (or other similar) tax(es) (state and local) payable as a result of the transfer of the Property to Purchaser and/or payable in connection with the recording of the Deed; and

            5.1.8      Any other expense(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing this transaction.

      5.2      <u>Seller's Costs.</u>  Seller shall pay:

            5.2.1      The fees and disbursements of Seller's counsel;

            5.2.2      One-half (½) of any escrow and closing fees to the Title Agent;

            5.2.3      One-half (½) of all recording fees payable in connection with the recording of the Deed or other documents recorded in connection with the transaction; and

            5.2.4      One-half (½) of any real estate transfer, stamp, recordation or documentary (or other similar) tax(es) (state and local) payable as a result of the transfer of the Property to Purchaser and/or payable in connection with the recording of the Deed.

      5.3      <u>Prorations.</u>

            5.3.1      All ad valorem and other taxes and assessments with respect to the Property (collectively, the "<u>Taxes</u>") shall be prorated as of 12:01 a.m. on the Date of Closing.  If the Closing shall occur before any applicable tax rate is fixed for the then current year, the apportionment of the Taxes shall be made upon the basis of the tax rate for the immediately preceding tax year applied to the latest assessed valuation of the Property.  Within thirty (30) days after the actual amount of the Taxes for the year in which the Closing occurs are determined, Seller and Purchaser shall adjust the proration of the Taxes and Seller or Purchaser, as the case may be, shall pay to the other any amount required as a result of such adjustment. All taxes assessed against the Property for prior years due to a change in use or ownership of the Property shall be paid by Seller.

16

5.3.2    All rent and other sums due under the Leases which are payable for periods sixty (60) days or less prior to the Date of Closing but which, as of the Date of Closing, have not been received by Seller, shall be credited to Seller at Closing and shall become property of Purchaser if and when such funds are collected provided that Seller shall not receive credit for such rent and other sums owed by account debtors who also have amounts due of more than sixty (60) days.  Any rental or other sums due under the Leases which are payable for periods more than sixty (60) days prior to the Date of Closing but which, as of the Date of Closing, have not been received by Seller, shall not be credited to Seller at Closing and shall become the property of Purchaser if and when such funds are collected.  Any rental or other sums payable under the Leases previously collected by Seller which represent payments attributable to the use of part or all of the Property on or after the Date of Closing shall be credited to Purchaser at Closing.

5.3.3    All unapplied security and similar deposits held by Seller under the Leases and all prepaid rent under the Leases (*i.e.*, rent paid with respect to any period following the month in which the Closing occurs) will be credited against the Purchase Price.

5.3.4    All other income and operating expenses of the Property, including, without limitation, public utility charges, maintenance, and other service charges, and all other normal operating expenses of the Property shall be prorated as of 12.01 a.m. on the Date of Closing based upon the best available information (it being understood that, unless otherwise indicated, Seller shall pay all amounts due with respect to the Property that accrue prior to the Date of Closing).

5.3.5    Seller shall be entitled to a credit at Closing for the amount of fuel on hand at the Property equal to the cost thereof to Seller.  Seller and Purchaser shall, on the day before the Date of Closing (or at such other time as they may agree), determine the amount of fuel on hand at the Property and mutually agree upon the credit to be provided to Seller under this Section 5.3.

5.4    <u>In General</u>.  Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom in the State of Florida.

5.5    <u>Purpose and Intent</u>.  Except as expressly otherwise provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Section 5 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight at the end of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.  The provisions of Sections 5.3 shall not be merged with the Deed but shall survive Closing.

6.    <u>Notices</u>. Any notice required or permitted to be given hereunder shall be deemed to be given (i) when personally delivered, (ii) two (2) business days after the date of posting if transmitted by United States mail, as registered or certified matter, return receipt requested, and postage prepaid, (iii) one (1) business day after pick-up if transmitted by nationally recognized overnight courier service, or (iv) the date sent if sent by electronic mail prior to 5:00 p.m. eastern time on a business day, in each case addressed to the parties at their respective addresses referenced below:

If to Seller:    Meridian Marina & Yacht Club of Palm City, LLC
810 Saturn Street, #24
Jupiter, Florida  33477
Attn:  David Kendall
Email: _____

17

With a copy to:        _____
                              _____
                              _____

If to Purchaser:       Marina Development Partners, LLC
                              4767 New Broad Street
                              Orlando, Florida  32814
                              Attn:  Matthew Juall
                              Email: mjuall@marinadp.com

With a copy to:       Holland & Knight LLP
                              701 Brickell Avenue, Suite 3300
                              Miami, Florida  33131
                              Attention: John Halula, Esq.
                              Email: john.halula@hklaw.com

or in each case to such other address as either party may from time to time designate by giving notice in writing to the other party.  Effective notice will be deemed given only as provided above. Purchaser's and Seller's counsel may send notices on behalf of Purchaser and Seller, respectively.

7.     <u>Closing and Escrow.</u>

     7.1     <u>Escrow Instructions</u>.  Upon execution of this Agreement, the parties shall deliver an executed counterpart of this Agreement to the Title Agent to serve as the instructions to the Title Agent as the escrow holder for consummation of the transaction contemplated herein.  Seller and Purchaser agree to execute such additional and supplementary escrow instructions as may be appropriate to enable the Title Agent to comply with the terms of this Agreement, provided, however that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall prevail.

     7.2     <u>Seller Deliveries</u>.  Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents with respect to the Property, each executed and, if required, acknowledged:

         7.2.1     The Deed.

         7.2.2     A bill of sale in the form attached hereto as <u>Exhibit 7.2.2</u> conveying the Personal Property and such other portions of the Property described therein.

         7.2.3     An assignment of the Leases by way of an assignment and assumption agreement in the form attached hereto as <u>Exhibit 7.2.3</u>.

         7.2.4     An assignment of the Assumed Contracts to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as <u>Exhibit 7.2.4.</u>

         7.2.5     An assignment of Seller's right, title and interest in and to the Submerged Land Lease in a form reasonably acceptable to Purchaser and Seller.

         7.2.6     A signed settlement statement setting forth the payments, debits and credits to occur at Closing, including the Purchase Price, the Deposit and the Closing prorations referenced above.

#74208531_v2

7.2.7   A certificate pursuant to the Foreign Investment in Real Property Tax Act in standard form.

7.2.8   An "Owner's Affidavit", in form reasonably acceptable to Purchaser and the Title Agent and sufficient for the Title Agent to delete any exceptions for (a) subject to the provisions of Section 3.3 hereof, mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder, and (b) parties in possession, other than tenants as tenants only.

7.2.9   A gap affidavit, in form reasonably acceptable to Purchaser and the Title Agent, to accommodate a so-called "New York" style closing where the transaction can close and funds can be wired prior to the actual recording of documents.

7.2.10   A certificate dated as of the Date of Closing certifying that all of the Seller's representations and warranties set forth in this Agreement remain true and correct in all material respects as of the Date of Closing, or if not, specifying the respect in which any such representation or warranty is no longer true.

7.2.11   A Rent Roll certified by Seller within fourteen (14) days of the Date of Closing to be correct as of the certification date.

7.2.12   To the extent they are in Seller's possession, executed originals or counterparts of all Leases, including without limitation, the Submerged Land Lease.

7.2.13   Notices to Tenants in a form reasonably acceptable to Purchaser, which Purchaser agrees to deliver to the tenants after the Closing.  This covenant shall survive Closing.

7.2.14   All keys in Seller's possession or control to all locks on the Property.

7.2.15   Such resolutions in form and content as the Title Agent may reasonably request evidencing Seller's existence, power and authority to enter into and execute this Agreement and to consummate the transactions herein contemplated.

7.2.16   Such other documents as the Title Agent may reasonably require.

7.3   <u>Purchaser's Deliveries.</u>  At the Closing, Purchaser shall (i) pay Seller the Purchase Price; and (ii) execute and deliver to Seller the agreements referred to in Sections 7.2.3, 7.2.4, 7.2.5 and 7.2.6, any required state and local conveyance tax statements and forms and such other documents as the Title Agent may reasonably require.

7.4   <u>Insurance.</u>  Seller shall terminate its policies of insurance as of noon on the Date of Closing and Purchaser shall be responsible for obtaining its own insurance thereafter.

7.5   <u>Utility Service and Deposits.</u>  Seller shall be entitled to the return of any deposit(s) posted by it with any utility company and Purchaser shall notify each utility company serving the Property to terminate Seller's accounts, effective at noon on the Date of Closing.

7.6   <u>Notice Letters.</u>  At Closing, Seller shall provide to Purchaser, in a form reasonably acceptable to Seller and Purchaser, a Seller executed form letter to the tenants under the Leases advising them of the sale of the Property to Purchaser and directing such tenants to pay Purchaser the rent and other sums due under the Leases from and after the Date of Closing.

8.      Default; Failure of Condition.

        8.1     PURCHASER DEFAULT.   IF PURCHASER SHALL DEFAULT UNDER THIS AGREEMENT AND SUCH DEFAULT SHALL CONTINUE FOR TEN (10) DAYS AFTER NOTICE THEREOF FROM SELLER, THE DEPOSIT SHALL BE RETAINED BY SELLER AS LIQUIDATED DAMAGES, AND BOTH PARTIES SHALL BE RELIEVED OF AND RELEASED FROM ANY FURTHER LIABILITY HEREUNDER.  SELLER AND PURCHASER AGREE THAT THE DEPOSIT IS A FAIR AND REASONABLE AMOUNT TO BE RETAINED BY SELLER AS AGREED AND LIQUIDATED DAMAGES IN LIGHT OF SELLER'S REMOVAL OF THE PROPERTY FROM THE MARKET AND THE COSTS INCURRED BY SELLER AND SHALL NOT CONSTITUTE A PENALTY OR A FORFEITURE.

        8.2     SELLER DEFAULT.   IF SELLER SHALL REFUSE OR FAIL TO CONVEY THE PROPERTY AS HEREIN PROVIDED OR OTHERWISE DEFAULT UNDER THIS AGREEMENT, FOR ANY REASON OTHER THAN (I) A DEFAULT BY PURCHASER OR (II) ANY OTHER PROVISION OF THIS AGREEMENT WHICH PERMITS SELLER TO TERMINATE THIS AGREEMENT OR OTHERWISE RELIEVES SELLER OF THE OBLIGATION TO CONVEY THE PROPERTY AND SUCH FAILURE OR DEFAULT SHALL CONTINUE FOR TEN (10) DAYS AFTER NOTICE THEREOF FROM PURCHASER, PURCHASER SHALL ELECT AS ITS SOLE REMEDY HEREUNDER EITHER TO TERMINATE THE AGREEMENT AND RECOVER THE DEPOSIT OR TO ENFORCE SELLER'S OBLIGATIONS UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, SELLER'S OBLIGATION TO CONVEY THE PROPERTY.  IN ADDITION, IF AND ONLY IF SELLER'S DEFAULT HEREUNDER IS A WILLFUL, INTENTIONAL DEFAULT AND PURCHASER TERMINATES THIS AGREEMENT AS DESCRIBED ABOVE AS A RESULT OF SAME, PURCHASER SHALL BE ENTITLED TO RECOVER FROM SELLER PURCHASER'S REASONABLE, ACTUAL, THIRD PARTY COSTS AND EXPENSES IN CONNECTION WITH THIS AGREEMENT AND PURCHASER'S INSPECTIONS.

9.      Miscellaneous.

        9.1     Entire Agreement.  This Agreement, together with the Exhibits attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

        9.2     Severability.   If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

        9.3     Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Florida.

        9.4     Assignability.  Purchaser may not assign this Agreement without first obtaining Seller's written consent, except that Purchaser may assign this Agreement to an affiliate of Purchaser.  Any assignment in contravention of this provision shall be void.  No assignment shall release the Purchaser herein named from any obligation or liability under this Agreement.  Any permitted assignee shall be deemed to have made any and all representations and warranties made by Purchaser hereunder, as if the assignee were the original signatory hereto.

#74208531_v2

9.5    <u>Successors Bound</u>.  This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their successors and permitted assigns.

9.6    <u>No Public Disclosure</u>.  Purchaser shall make no public disclosure of the terms of this transaction without the prior written consent of Seller, except that Purchaser may discuss the transaction in confidence with proposed joint ventures or prospective mortgagees.

9.7    <u>Captions</u>.  The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of it provisions.

9.8    <u>Attorneys' Fees</u>.  In the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

9.9    <u>No Partnership</u>. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest.

9.10    <u>Time of Essence</u>. Time is of the essence in this Agreement.

9.11    <u>Counterparts</u>.  This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.  Delivery by facsimile or by electronic transmission in portable document format (PDF) of an executed counterpart of this Agreement is as effective as delivery of an originally executed counterpart of this Agreement.

9.12    <u>Recordation</u>.  Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

9.13    <u>Proper Execution</u>. The submission by Seller to Purchaser of this Agreement in unsigned form shall be deemed to be a submission solely for Purchaser's consideration and not for acceptance and execution.  Such submission shall have no binding force and effect, shall not constitute an option, and shall not confer any rights upon Purchaser or impose any obligations upon Seller irrespective of any reliance thereon, change of position or partial performance.  The submission by Seller of this Agreement for execution by Purchaser and the actual execution and delivery thereof by Purchaser to Seller shall similarly have no binding force and effect on Seller unless and until Seller shall have executed this Agreement and a counterpart thereof shall have been delivered to Purchaser.

9.14    <u>Merger</u>.  Except as otherwise expressly provided herein, Purchaser's acceptance of the Deed shall be deemed a discharge of all of the obligations of Seller hereunder and all of Seller's representations, warranties, covenants and agreements herein shall merge in the documents and agreements executed at the Closing and shall not survive the Closing.

9.15    <u>Limited Recourse</u>.  Purchaser agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed direct or indirect member of any Seller or any direct or indirect member, manager officer, director, employee, agent, trustee, shareholder, partner, principal, parent, subsidiary or other affiliate of Seller or any member or manager of Seller (collectively, the "<u>Seller's Affiliates</u>"), arising out of or in connection with this Agreement or the transactions contemplated hereby. Purchaser agrees not to sue or otherwise seek to enforce any personal obligation against any of Seller's Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.

#74208531_v2

Seller agrees that it does not have and will not have any claims or causes of action against any disclosed or undisclosed direct or indirect member of Purchaser or any direct or indirect member, manager officer, director, employee, agent, trustee, shareholder, partner, principal, parent, subsidiary or other affiliate of Purchaser or any member or manager of Purchaser (collectively, the "Purchaser's Affiliates"), arising out of or in connection with this Agreement or the transactions contemplated hereby. Seller agrees not to sue or otherwise seek to enforce any personal obligation against any of Purchaser's Affiliates with respect to any matters arising out of or in connection with this Agreement or the transactions contemplated hereby.

9.16    Survival of Representations and Warranties.  The representations and warranties of Seller set forth in Section 4.1 of this Agreement shall survive the Closing, but written notification of any claim arising therefrom must be received by Seller within two (2) years after the Date of Closing or such claim shall be forever barred and Seller shall have no liability with respect thereto.

9.17    Like-Kind Exchange.  Purchaser may be acquiring the Property or Seller may elect to sell the Property as part of an Internal Revenue Code Section 1031 tax deferred exchange.  Each party agrees to assist and cooperate in such exchange at no cost, expense or liability to the cooperating party and further agrees to execute any and all documents as are reasonably necessary, in connection with such exchange. The applicable party may be assigning, and is permitted to assign, all contract rights and obligations hereunder to a "qualified intermediary", as that term is defined in the Internal Revenue Code and relevant Treasury regulations, in connection with an exchange.  In connection with any such exchange, neither Purchaser nor Seller shall be obligated to acquire or convey any property other than the Property.  No such permitted assignment under this Section 9.17 shall relieve either Purchaser or Seller of any liability hereunder.

9.18    Calculation of Time Periods.  If any date upon which some action, notice or response is required of any party hereunder occurs on a weekend or national holiday, such action, notice or response shall not be required until the next succeeding business day.

9.19    Force Majeure.  "Force Majeure" shall mean any Act of God, earthquake, hurricane, flood, fire, or extraordinary weather condition; riot, war, or order of a civil, military or naval authority; strikes, labor disputes, or any other course of events reasonably beyond either party's control.  In the event that either party shall claim a delay based upon Force Majeure, such party shall immediately advise the other of the commencement and resolution of any Force Majeure event. All time periods shall be extended for the period of time during which the Force Majeure event existed and actually affected the performance.

10.    Purchase Option.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller[1] irrevocably grants, conveys and transfers to Purchaser the option to purchase (the "Option to Purchase") that certain land located in Martin County, Florida more specifically described in Exhibit 10.1 attached hereto and comprising approximately 4.5 acres, including any and all buildings, improvements, alterations, and additions located thereon and all easements and other rights appurtenant thereto (the "Option Property"), subject to the following terms and conditions:

10.1    Exercise of Option; Assignability.  Buyer must exercise this Option to Purchase, if at all, by giving to Seller sixty (60) days' prior written notice of such exercise, which notice shall be given no later than [three (3)] years following the Date of Closing (the "Option Notice").  To constitute effective notice, the Option Notice must be sent in accordance with Section 6 above.  The Option  to Purchase is assignable by Purchaser in accordance with Section 9.4 above.

---

[1] NTD – Need to confirm owner of Option Property.

22

10.2    Purchase Price.  The purchase price for the Option Property shall be Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) (the "Option Property Purchase Price"), which shall be payable, at Purchaser's option, either (a) in full at the closing on the purchase of the Option Property, or (b) a cash payment of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) at the Option Property closing with Seller financing for the balance payable as a balloon payment thirty-six (36) months after the Option Property closing.  Interest shall accrue on the Seller financing at a fixed rate of five percent (5%) per annum.

10.3    Purchase Agreement.  Within fifteen (15) days of delivery of the Option Notice, the Seller and Purchaser shall enter into a Purchase and Sale Agreement, substantially in the form of this Agreement, for the purchase and sale of the Option Property (the "Option PSA").  Purchaser shall have the right to conduct its own due diligence investigations of the Option Property, on substantially the same terms and conditions as set forth in this Agreement.  Following the execution of such Option PSA, the Seller shall sell and Purchaser shall acquire the Option Property in accordance with the terms and conditions of the Option PSA.

10.4    Zoning/Land Use Approvals.  Purchaser will have the right, at its expense, to rezone or obtain variances for the Option Property, or obtain other building, zoning, development, annexation or similar relief from the governing authorities, including Martin County, or other applicable governmental agencies ("Governmental Approvals") required to permit the construction of [_____] dry slips and related amenities on the Option Property.  Seller covenants and agrees to execute all applications and other customary documents reasonably required by Purchaser in connection with the Governmental Approvals.

10.5    Use of Option Property.  Between the date of this Agreement and the earlier of the "Date of Closing" under the Option PSA, or the expiration of this Option to Purchase, Seller shall comply with all of the following requirements with respect to the Option Property: (i) Seller shall not solicit or accept an offer for the purchase of all or part of the Option Property, or for the purchase of an ownership interest in Seller, or for the formation of a joint venture with Seller or its members with respect to the Option Property, or any part thereof, from any party other than the Purchaser; (ii) Seller shall not convey or permit the conveyance of any interest in the Option Property, or any part thereof, nor shall the Seller permit any of the same to occur by any affiliate, subsidiary, member, manager, principal of Seller, or other party related to Seller; (iii) except as contemplated in Section 10.4 above, Seller shall not join in, or agree to any change in zoning of the Option Property or seek any zoning variance; and (iv) Seller shall not create or agree to any new exceptions to title to the Option Property without obtaining the Purchaser's prior written consent, not to be unreasonably withheld, conditioned or delayed.

10.6    Memorandum of Option.  Seller and Purchaser shall enter into a Memorandum of Option in form and substance acceptable to Purchaser, which Memorandum of Option shall be recorded in the public records against the Option Property on the Date of Closing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

23

    IN WITNESS WHEREOF, Purchaser and Seller have executed this Agreement on the date(s) set forth below, effective as of the date set forth above.

**SELLER:**

**Meridian Marina & Yacht Club of Palm City, LLC**,
a Florida limited liability company

By:_____
Name:
Title:

**PURCHASER:**

**MARINA DEVELOPMENT PARTNERS, LLC**,
a Florida limited liability company

By:_____
   Matthew K. Juall, President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

24

An original executed copy of this Agreement, together with the Deposit, has been received by the Title Agent this _____ day of _____, 2020, and by execution hereof the Title Agent hereby covenants and agrees to be bound by the terms of this Agreement which are applicable to the Title Agent.

**HOLLAND & KNIGHT LLP**

By: _____
     John Halula, Partner

25

EXHIBIT 1.1.1
LEGAL DESCRIPTION OF LAND

[**TO BE PROVIDED**]

EXHIBIT 1.1.3
<u>INVENTORY OF PERSONAL PROPERTY</u>

[**TO BE PROVIDED**]

EXHIBIT 1.1.6
<u>LEASES</u>

1.      [To Be Inserted]

EXHIBIT 3.1
Books and Records

Subject to the terms of Section 3.1 of the Agreement, Seller shall provide copies of the following documents to Purchaser pursuant to Section 3.1:

1. Title Policy from Seller's Purchase
2. Survey from Seller's Purchase
3. Operating Budget for 2020
4. Property Operating Statements year to date
5. Property Operating Statements for 2017, 2018 & 2019
6. Accounts receivable and accounts payable schedules for 2018 & 2019
7. List of all Employees, Job Descriptions, Wages & Benefits
8. Service Contracts
9. Utility Bills (past six (6) months)
10. Property Tax Bills (past 2 years)
11. Evidence of payment of sales tax (past 2 years)
12. All Appraisals of all or any portion of the Property
13. All environmental assessment or remediation reports received by Seller
14. All engineering/physical condition reports, including any PZR Reports
15. Soils & Geotechnical Reports
16. All shoreline reviews
17. Site Plan and Layout, and Building Plans for any Improvements
18. Licenses and permits, including certificates of occupancy
19. As-Built Construction Drawings for Buildings, Utilities, Piers and Plant
20. Property Insurance – 5 year loss history
21. Storm Water Prevention Plan
22. List of any pending litigation
23. Warranty information on building systems and docks
24. Current rent roll for wet slips, lift slips and dry stacks, including security deposits
25. Copies of all Reservations (historical & pending) and deposit logs for boats
26. Marketing Mailing Lists, Email Blasts, Customer Profiles and Boat Profile Documentation
27. Copies of all Leases, equipment or otherwise
28. All current leases for boat shop, dealership and restaurant
29. Information on owned and leased equipment
30. Information on all rental boats
31. Copies of all Approvals and License Agreements, including DEP, DERM, Army Corp of Engineer, Marine Operators Permit, County/City Regulation Approval of Slips (dry, wet, lift)
32. Copies of all Bathymetric Surveys & Documents that Support a History of Dredging Events, Expected Dredging Requirements, Availability of Dredge Permit and Available Disposal
33. All information on the storage tanks including line tests and compliance certificates
34. All letters, agreements and other correspondence with the Army Corp of Engineers
35. Full list of Capex for the last 5 years
36. Dock permits, applications and other correspondence with water governing authority
37. All lease documents and correspondence related to the Submerged Land Lease
38. Copy of all Emergency Response Plans

#74208531_v2

EXHIBIT 3.3
<u>SCHEDULE OF CONTRACTS</u>

[**TO BE PROVIDED, INCLUDING IDENTIFICATION OF ANY CONTRACTS WHICH CANNOT BE TERMINATED EFFECTIVE AS OF CLOSING**]

EXHIBIT 4.1.10
<u>RENT ROLL</u>

#74208531_v2

EXHIBIT 7.2.2
FORM OF BILL OF SALE

BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that **MERIDIAN MARINA & YACHT CLUB OF PALM CITY, LLC**, a Florida limited liability company, with an address at 810 Saturn Street, #24, Jupiter, Florida  33477, Attn:  David Kendall, Email: _____, ("Seller"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) in lawful money of the United States of America, to Seller in hand paid by and _____, a _____ ("Purchaser"), with an address at 4767 New Broad Street, Orlando, Florida 32814, Attn: Matthew Juall, Email: mjuall@marinadp.com, the receipt and sufficiency of which are hereby acknowledged, does by these presents grant, bargain, sell, assign and deliver unto Purchaser, in accordance with that certain Purchase and Sale Agreement dated [_____], 2020 (as amended and assigned, the "Agreement") between Seller and Purchaser (as successor-in-interest to Marina Development Partners, LLC by virtue of an assignment instrument), the following property located on or used in connection with the real property described on Exhibit A attached hereto (the "Land"):

(i)    All of Seller's right, title and interest in and to the tangible personal property and fixtures of any kind attached to or used in connection with the ownership, maintenance, management or operation of the Land, Improvements or business operations thereon, including, without limitation, any docks, piers, landings, wet slips, dry slips, boat lifts, barges, boats, vehicles and inventory;

(ii)    With respect to the Improvements and to the extent transferable, all of Seller's right, title and interest in and to all warranties and guaranties made or received from any individual or entity with respect to any building component, machinery, equipment or material comprising a part of any Improvement;

(iii)    All of Seller's right, title and interest in and to all transferable building plans, floor plans, and specifications and surveys relating to the Improvements;

(iv)    All of Seller's right, title and interest in and to all transferable consents, authorizations, variances or waivers, licenses, permits and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality solely in respect of the Land or the Improvements; and

(v)    any other personal property specifically identified on Exhibit B attached hereto.

TO HAVE AND TO HOLD the same to Purchaser and its successors and assigns forever.  Seller has not made and does not make any express or implied warranty or representation of any kind whatsoever with respect to the property conveyed hereby, including, but not limited to:  title; merchantability of such property or its fitness for any particular purpose; the design or condition of such property; the quality or capacity of such property; workmanship or compliance of such property with the requirements of any law, rule, specification or contract pertaining thereto; patent infringement or latent defects.  Purchaser accepts the property conveyed hereby on an "AS IS, WHERE IS" basis.  Capitalized but otherwise undefined terms used in this Bill of Sale shall have the meanings ascribed to such terms in the Agreement.

#74208531_v2

IN WITNESS WHEREOF, Seller has caused this instrument to be executed and delivered as of this _____ day of _____, 2020.

**SELLER:**

**Meridian Marina & Yacht Club of Palm City, LLC**,
a Florida limited liability company

By:_____
Name:
Title:

[Exhibits to be attached:
      Exhibit A – Legal Description
      Exhibit B – Tangible Personal Property]

#74208531_v2

EXHIBIT 7.2.3
FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES

ASSIGNMENT AND ASSUMPTION OF LEASES

For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, **Meridian Marina & Yacht Club of Palm City, LLC**, a Florida limited liability company, with an address at 810 Saturn Street, #24, Jupiter, Florida 33477, Attn: David Kendall, Email: _____ ("Assignor"), hereby conveys to _____ TBD _____, a _____ TBD _____, with an address [_____ TBD _____ ("Assignee"), and Assignee hereby agrees to assume and accept the assignment and delegation of all of Assignor's right, title and interest in and to and obligations under the Leases, first accruing from and after the date hereof, set forth on Exhibit B attached hereto and incorporated herein relating to certain improved real property located along the shores of the St. Lucie River in Martin County, Florida commonly known as "Meridian Marina" and more particularly described on Exhibit A attached hereto, in accordance with that certain Purchase and Sale Agreement dated [_____], 2020 (as amended and assigned, the "Agreement") between Assignor and Assignee.

If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment and Assumption of Leases (this "Assignment") or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation including, without limitation, reasonable attorneys' fees.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

#74208531_v2

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of this ___ day of _____, 2020.

**ASSIGNOR:**

**Meridian Marina & Yacht Club of Palm City, LLC**,
a Florida limited liability company

By:_____
Name:
Title:

**ASSIGNEE:**

_____,
a _____ limited liability company

By:        _____
Name:   _____
Title:     _____

[Exhibits to be attached:
        Exhibit A – Legal Description
        Exhibit B – Schedule of Leases]

EXHIBIT 7.2.4
FORM OF ASSIGNMENT AND ASSUMPTION OF CONTRACTS

ASSIGNMENT AND ASSUMPTION OF CONTRACTS

In consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **Meridian Marina & Yacht Club of Palm City, LLC**, a Florida limited liability company, with an address at 810 Saturn Street, #24, Jupiter, Florida 33477, Attn: David Kendall, Email: _____ ("Assignor"), hereby assigns, without representation warranty or covenant, and delegates to _____TBD_____ , a _____TBD_____, with an address [_____ _____TBD_____ ("Assignee"), and Assignee hereby assumes, with respect to all obligations first accruing from and after the date hereof, and accepts the assignment and delegation of all of Assignor's right, title and interest in and to the contracts described on Exhibit B attached hereto relating to certain improved real property located along the shores of the St. Lucie River in Martin County, Florida commonly known as "Meridian Marina" and more particularly described on Exhibit A attached hereto (collectively the "Contracts"), in accordance with that certain Purchase and Sale Agreement dated [_____], 2020 (as amended and assigned, the "Agreement") between Assignor and Assignee.

If any litigation between Assignor and Assignee arises out of the obligations of the parties under this Assignment and Assumption of Leases (this "Assignment") or concerning the meaning or interpretation of any provision contained herein, the losing party shall pay the prevailing party's costs and expenses of such litigation including, without limitation, reasonable attorneys' fees.

This Assignment may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

#74208531_v2

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the _____ day of _____, 2020.

**ASSIGNOR:**

**Meridian Marina & Yacht Club of Palm City, LLC**,
a Florida limited liability company

By:_____
Name:
Title:


**ASSIGNEE:**

_____,
a _____ limited liability company


By:      _____
Name:  _____
Title:   _____

[Exhibits to be attached:
        Exhibit A – Legal Description
        Exhibit B – Schedule of Contracts]

EXHIBIT 10.1
<u>LEGAL DESCRIPTION OF OPTION LAND</u>

[**TO BE PROVIDED**]